1
2
3
4
5

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

6
7
8   A.I.I.L., et al.,

9                Plaintiffs,

10  v.

11  Jefferson Beauregard Sessions, III, et al.,

12                Defendants.

13

No. CV-19-00481-TUC-JCH

**ORDER**

14        This putative class action stems from the forced separation of undocumented parents

15   from their minor children in Arizona and other places along the United States-Mexico

16   border. (*See generally* Doc. 41, the First Amended Complaint, hereinafter "FAC.") The

17   FAC asserts claims against fifteen individual federal officials (collectively "Individual

18   Defendants") and the United States Government ("United States Defendant"). (*See*

19   *generally id.*) Individual Defendants are fifteen former cabinet heads, Senate-confirmed

20   appointees, and high-ranking executive officials representing the Department of Homeland

21   Security ("DHS"), U.S. Customs & Border Protection ("CBP"), Immigration and Customs

22   Enforcement ("ICE"), and U.S. Customs & Immigration Services ("USCIS").[1]

23   _____

[1] Individual Defendants include: former White House Chief of Staff **John F. Kelly**; Senior
24   Advisor to the President **Stephen Miller**; former Attorney General ("AG") **Jefferson B.
     Sessions, III**; Counselor to the AG **Gene Hamilton**; former Secretary of DHS **Kirstjen
25   Nielsen**; former Acting Secretary of DHS & former Commissioner of CBP **Kevin K.
     McAleenan**; former Chief Operating Officer and Senior Official Performing the Duties of
26   the Commissioner of CBP **Mark Morgan**; former Chief of United States Border Patrol
     **Carla Provost**; former Acting Director of ICE **Matthew Albence**; former Director of ICE
27   **Thomas Homan**; former Acting Director of ICE **Ronald D. Vitiello**; former Director of
     USCIS **L. Francis Cissna**; former Secretary of Health and Human Services ("HHS") **Alex
28   Azar**; former HHS Counselor for Human Services Policy **Margaret Wynne**; and former
     Director of the Office of Refugee Resettlement ("ORR") **Scott Lloyd**. (Doc. 41 at 8–13.)

Pending before the Court is the Individual Defendants' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim ("Motion"), filed pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (Doc. 52.) The Motion is fully briefed.[2] (Doc. 54; Doc. 61.) For the following reasons, the Court will grant the Motion and dismiss the claims against the Individual Defendants.[3]

## I.  BACKGROUND[4]

### A.  NAMED PLAINTIFFS

#### 1.  A.I.I.L., J.A.H.I., and M.E.H.I.

Plaintiffs nine-year-old J.A.H.I. and ten-year-old M.E.H.I. arrived in the United States with their mother, A.I.I.L., near San Luis, Arizona on May 25, 2018. (FAC at ¶ 19.) After fleeing Guatemala, A.I.I.L. and her children arrived in the United States seeking asylum. (*Id.*) They were originally detained and processed at a CBP[5] station where conditions were overcrowded. (FAC at ¶ 63.) All three individuals showed signs of heat exhaustion. (FAC at ¶¶ 62–63.) M.E.H.I. had blood and vomit caked on his clothing, yet CBP agents did not provide him medical attention. (*Id.*) On the same day that CBP took A.I.I.L. and her children into custody, an unidentified CBP agent informed A.I.I.L. that her children would be taken from her, and shortly thereafter, the children were separated from A.I.I.L. (FAC at ¶ 64.)  The family was held in Arizona for four days, although the non-English speaking J.A.H.I. and M.E.H.I. were held in a separate area from their mother. (FAC at ¶ 67.) J.A.H.I. and M.E.H.I. were transferred to ORR custody and held at a shelter in Miami, Florida. (FAC at ¶¶ 67, 72.) A.I.I.L. was detained in Arizona for approximately

[2] This Motion became ripe for consideration on February 5, 2021. However, this matter was stayed between June 1, 2021 through January 7, 2022, as Plaintiffs pursued global settlement negotiations with the United States Defendant. (*See* Doc. 63; Doc. 66; Doc. 67; Doc. 69; Doc. 73; Doc. 74; Doc. 75.)

[3] The Court finds that the Motion is suitable for resolution without oral argument pursuant to LRCiv 7.2(f).

[4] The facts are taken directly from the FAC and are accepted as true.

[5] The United States Border Patrol is the federal law enforcement organization under the umbrella of CBP. *See https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices.* For purposes of consistency, the Court will use CBP as this is the term used in the FAC.

six weeks. (FAC at ¶¶ 68–73.)   During this period, she was served uncooked ramen noodles, verbally harassed, and provided little information regarding her children's whereabouts or status. (FAC at ¶¶ 19, 68–72.) Three weeks after their separation, A.I.I.L. was able to speak with her children by phone, and thereafter she could only afford short and infrequent calls. (FAC at ¶ 72.) On July 10, 2018, nearly seven weeks after their separation, A.I.I.L., J.A.H.I., and M.E.H.I. were reunited in Miami, Florida. (FAC at ¶ 73.) A.I.I.L. was never criminally charged in connection with her entry into the United States. (FAC at ¶ 73.) A.I.I.L., J.A.H.I., and M.E.H.I. have since been granted asylum. (FAC at ¶¶ 19, 75.) They continue to suffer emotional trauma because of the forced separation. (FAC at ¶ 76.)

### 2.  L.L.H.O. and K.E.O.H.

Plaintiffs thirteen-year-old K.E.O.H. and her mother L.L.H.O. arrived in the United States in Nogales, Arizona on December 22, 2017, seeking asylum after fleeing El Salvador. (FAC ¶ 20.) L.L.H.O. and K.E.O.H. presented themselves to CBP officers at the DeConcini Port of Entry and were taken into custody. (FAC at ¶ 79.) Conditions at the CBP facility were overcrowded and cold. (FAC at ¶ 80.) Thereafter, L.L.H.O. and K.E.O.H. were transferred to multiple different detention facilities. (FAC at ¶ 81.) L.L.H.O. and K.E.O.H. were separated without warning in Phoenix, Arizona, on December 25, 2017. (FAC at ¶ 82.) K.E.O.H. was kept handcuffed for hours after the separation as she fought to be reunited with her mother. (FAC at ¶ 83.) Later, L.L.H.O. was told that consenting to her own removal from the U.S. was the only path to reunification with her daughter. (FAC at ¶ 88.) In reliance on this false representation, L.L.H.O. agreed to be deported and the government deported her to El Salvador on March 21, 2018. (*Id.*) Meanwhile, K.E.O.H. was detained for approximately eight months in Mesa, Arizona, before being transferred to foster care in the Bronx, New York. (FAC at ¶ 88.) During this period K.E.O.H. suffered from depression, anxiety, and even contemplated suicide. (FAC at ¶ 90.) L.L.H.O. and K.E.O.H. were eventually reunited 16 months after their forced separation.[6] (FAC at ¶ 91.)

---

[6] The FAC does not specify where their reunion occurred.

1   L.L.H.O. was never criminally charged in connection with her entry into the United States.

2   (FAC at ¶ 84.) L.L.H.O. and K.E.O.H. are currently seeking asylum or withholding of

3   removal. (FAC at ¶ 93.) They continue to suffer emotional trauma because of the forced

4   separation. (FAC at ¶ 92.)

5   ### 3.   J.L.V.A. and D.S.V.H.

6    Plaintiffs seven-year-old D.S.V.H. and her father J.L.V.A. arrived in the United

7   States[7] on June 4, 2018, seeking asylum after fleeing Honduras. (FAC ¶ 94.) J.L.V.A. and

8   D.S.V.H. were held in a crowded and unclean holding cell with other parent-child pairs.

9   (FAC ¶ 95.) Sometime after midnight on June 5, 2018, J.L.V.A. and D.S.V.H. were

10  separated. (FAC at ¶ 96.) J.L.V.A. was not allowed to say goodbye to his sleeping daughter.

11  (*Id.*)   Following the separation, J.L.V.A. was detained for approximately eight weeks.

12  (FAC ¶ 97.) During that time he was provided no information about D.S.V.H. and did not

13  receive no medical care for the physical ailments he suffered because of the forced

14  separation. (FAC at ¶¶ 97–98.) D.S.V.H. was transferred to ORR custody and held at

15  Southwest Key facilities in Phoenix and Glendale, Arizona. (*Id.*) J.L.V.A. and D.S.V.H.

16  were eventually reunited approximately eight weeks after their forced separation. (FAC at

17  ¶¶ 99–100.) J.L.V.A. and D.S.V.H. are currently seeking asylum or withholding of

18  removal. (FAC at ¶ 102.) They continue to suffer emotional trauma because of the forced

19  separation. (FAC at ¶ 101.)

20  ### 4.   J.I.S. and B.L.S.P.

21   Plaintiffs three-year-old B.L.S.P. arrived with his father J.I.S. in the United States

22  in Arizona on December 24, 2017, seeking asylum after fleeing Guatemala. (FAC ¶ 22.)

23  They were taken into CBP custody where conditions were so overcrowded that there was

24  no place to lay down.  (FAC at ¶ 104.) At some point, an unidentified agent told J.I.S. that

25  he would be deported and his daughter would be taken away and kept in the United States.

26  (*Id.*) Two days later, J.I.S. and B.L.S.P. were separated. (FAC at ¶ 106.) J.I.S. was

27  transferred to multiple different detention facilities in Arizona. (FAC at ¶ 107.) As a result

28

---

[7] The FAC does not identify where D.S.V.H. and J.L.V.A. arrived in the United States. The government indicates their apprehensions occurred in Texas. (Doc. 53 at 43.)

of the separation, J.I.S. struggled to sleep and eventually developed pneumonia. (FAC at ¶ 108.) At some point, an unidentified ICE officer gave J.I.S. documents to sign even though J.I.S. did not read English and did not understand the documents. (FAC at ¶ 108.) The ICE officer told J.I.S. that he would be deported whether or not he signed, but that he would see his daughter sooner if he signed. (FAC at ¶ 109.) J.I.S. signed the documents and was deported to Guatemala in mid-January 2018 without seeing B.L.S.P. (*Id.*) Meanwhile, B.L.S.P. was placed in ORR custody and transferred to New York. (FAC at ¶ 110.) During this time, B.L.S.P. was subjected to physical abuse and sustained bruises on her legs and a scar on her back. (*Id.*) J.I.S. and B.L.S.P. were eventually reunited in Guatemala approximately six months after their separation. (FAC at ¶¶ 106, 109.) As a result of her time in ORR custody, B.L.S.P. lost her ability to speak and understand Mam, a Mayan-language used by her family members in Guatemala, including her mother. (FAC at ¶ 111.) B.L.S.P. continues to suffer behavioral issues because of the forced separation. (FAC at ¶ 112.)

### 5. J.J.P.B. and A.E.P.F.

Plaintiffs six-year-old A.E.P.F. and his father J.J.P.B. arrived in the United States[8] on May 16, 2018, seeking asylum after fleeing Honduras. (FAC ¶ 22.) J.J.P.B. and A.E.P.F. were held in a holding cell overnight. (FAC ¶ 114.) The next day, unidentified CBP agents separated J.J.P.B. and A.E.P.F. without explanation. (*Id.*) J.J.P.B. attempted to inform agents that A.E.P.F. had a heart murmur, however the CBP agents were uninterested in A.E.P.F.'s medical condition. (FAC ¶ 115.) After being removed, an unidentified CBP agent mocked J.J.P.B. for crying and falsely informed J.J.P.B. that he would see his son in three days. (FAC ¶ 116.) Meanwhile, A.E.P.F. was taken into ORR custody and later placed with a foster family in the Bronx, New York. (FAC at ¶ 117.) J.J.P.B. had limited communication with A.E.P.F. but was eventually permitted one 10-minute phone call every eight days. ((FAC at ¶ 118.) At some point, an unidentified ICE officer gave J.J.P.B. documents in English to sign. (FAC at ¶ 120.) J.J.P.B. did not understand the documents,

---

[8] The FAC does not identify where J.J.P.B. and A.E.P.F. arrived in the United States. The government indicates their apprehensions occurred in Texas. (Doc. 53 at 43.)

but the unidentified ICE officer told J.J.P.B. the forms were necessary for asylum. (*Id.*) Only after J.J.P.B. signed the forms did the ICE officer reveal that the documents gave J.J.P.B.'s consent to removal. (*Id.*) J.J.P.B. was deported in late-May 2018. (FAC at ¶ 121.) J.J.P.B. and A.E.P.F. were eventually reunited after nearly a year following their separation.[9] (FAC at ¶ 122.) J.J.P.B. was never criminally charged in connection with his entry into the United States. (FAC at ¶ 119.) J.J.P.B. and A.E.P.F. are currently seeking asylum or withholding of removal. (FAC at ¶ 124.) They continue to suffer emotional trauma because of the forced separation. (FAC at ¶ 123.)

## B. CLASS ALLEGATION

Plaintiffs also seek to represent a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(3). (FAC ¶ 270.) The two purported classes include:

(1) a nationwide class consisting of all minor children who since 2017 have arrived at or between ports of entry along the United States' southern border, and who have been separated from their parents by DHS or its sub-agencies (including CBP, ICE, or USCIS) without a demonstration in a hearing that the parent was unfit or presented a danger to that child (the "Child Class"); and

(2) a nationwide class consisting of all parents who since 2017 have arrived at or between ports of entry along the United States' southern border, and who have a minor child who was separated from them by DHS or its sub-agencies (including CBP, ICE, or USCIS) without a demonstration in a hearing that the parent is unfit or presents a danger to the child (the "Parent Class") [ ].

(FAC ¶ 271.) Plaintiffs further allege that the classes are so numerous that joinder of all members in each class is impracticable and that "[t]he exact number of persons in each Class is unknown at this time, but can be ascertained through appropriate discovery." (FAC ¶ 274.)

## C. PLAINTIFFS' CLAIMS

Relevant here are Counts I–VIII, which comprise the claims made against the individually named Defendants—each sued in a personal, not official capacity—under the

---

[9] The FAC does not specify where their reunion occurred. (*See* FAC ¶ 122.)

Fourth and Fifth Amendments to the United States Constitution, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. §§ 1985 and 1986 pursuant to 28 U.S.C. §§ 1331 and 1343(a).[10]

Plaintiffs' claims in this action arise out of "familial separations" enacted by certain agencies and officials of the United States Government. (FAC ¶¶ 125–226.) The allegations in the FAC are taken as true. In sum, undocumented parents and their children seeking asylum were forcibly separated in immigration detention facilities without benefit of prior legal proceedings. The separations continued even after the parents were returned to immigration detention or released from custody. More specifically, Plaintiffs assert claims against the Defendants for:

- Count I: violations of their Fifth Amendment right to family integrity against all Individual Defendants (FAC ¶¶ 282–92);

- Count II: violations of their Fifth Amendment substantive due process right to receive adequate medical care while in custody against Defendants Nielsen, Kelly, Homan, Vitiello, Albence, Cissna, McAleenan, Morgan, Azar, Lloyd, Provost, John/Jane Doe DHS Defendants, and John/Jane Doe HHS/ORR Defendants (FAC ¶¶ 293–302);

- Count III: violations of their Fifth Amendment substantive due process right to be free from punitive treatment against all Individual Defendants (FAC ¶¶ 303–11);

- Count IV: violations of their Fifth Amendment right to procedural due process against Defendants Sessions, Nielsen, Kelly, Homan, Vitiello, Alvence, Cissna, McAleenan, Morgan, Hamilton, Provost, and John/Jane Doe DHS Defendants (FAC ¶¶ 312–19);

- Count V: violations of their Fifth Amendment right to equal protection under the law against all Individual Defendants (FAC ¶¶ 320–28);

- Count VI: violations of their Fourth Amendment right against unreasonable seizures

---

[10] Plaintiffs' remaining claims, Counts IX–XI, are asserted against the United States Defendant under the Federal Tort Claims Act pursuant to 28 U.S.C. §§ 1346(b)(1) and 2675. (FAC ¶¶ 350–62). Those claims are not addressed in this order.

against Defendants Sessions, Nielsen, Kelly, Homan, Vitiello, Alvence, Cissna, McAleenan, Morgan, Hamilton, Provost, and John/Jane Doe DHS Defendants (FAC ¶¶ 329–38);

- Count VII: statutory claims for conspiracy to interfere with Civil Rights, in violation of 42 U.S.C. § 1985(3) against Defendants Sessions, Nielsen, Kelly, Miller, Hamilton, Homan, Vitiello, Cissna, McAleenan, Lloyd, Provost, John/Jane Doe DHS Defendants at CBP and ICE, and John/Jane Doe HHS/ORR Defendants (FAC ¶¶ 339–44);

- Count VIII: refusal or neglect to prevent or aid in a conspiracy to interfere with Civil Rights, in violation of 42 U.S.C. § 1986 against all Individual Defendants (FAC ¶¶ 345–49).

## II.   THE MOTION TO DISMISS

The Individual Defendants move to dismiss the FAC on the following grounds: lack of personal jurisdiction; improper extension under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); qualified and absolute immunity; failure to state a claim under 42 U.S.C. §§ 1985(3) and 1986. (Doc. 52 at 57–59.) The Court considers each defense in turn.

### A. LACK OF PERSONAL JURISDICTION
#### 1. LEGAL STANDARD

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs.*, Inc., 647 F.3d 1218, 1223 (9th Cir.2011). "The plaintiff cannot 'simply rest on the bare allegations of its complaint,' but uncontroverted allegations in the complaint must be taken as true." *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). The Court

1    may not assume the truth of allegations in a pleading that are contradicted by an affidavit,

2    but factual disputes are resolved in Plaintiff's favor. *Id.* (quoting *Data Disc, Inc. v. Sys.*

3    *Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir.1977)). If the plaintiff survives the motion

4    to dismiss, the plaintiff still must prove the jurisdictional facts by a preponderance of the

5    evidence at a preliminary hearing or at trial. *Data Disc*, 557 F.2d at 1285 n. 2.

6         Federal courts ordinarily follow state law in determining the bounds of their

7    jurisdiction over persons. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Arizona has

8    authorized its courts to exercise personal jurisdiction to the maximum extent permitted by

9    the Due Process Clause of the Constitution. *See* Ariz. R. Civ. P. 4.2(a). Under the Due

10   Process Clause, a federal district court may exercise jurisdiction over a person who is not

11   physically present within the territorial jurisdiction of the court. *See Walden v. Fiore*, 571

12   U.S. 277, 283 (2014). The nonresident generally must have certain minimum contacts with

13   the forum so that the maintenance of the suit does not offend traditional notions of fair play

14   and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

15        A nonresident's contacts with the forum may allow a district court to exercise either

16   general or specific personal jurisdiction. *In re W. States Wholesale Natural Gas Antitrust*

17   *Litig.*, 715 F.3d 716, 741 (9th Cir. 2013), *cert. granted sub nom. Oneok, Inc. v. Learjet,*

18   *Inc.*, 573 U.S. 957 (2014). In this case, Plaintiffs argue that this Court has specific personal

19   jurisdiction over the individual defendants based on their intentionally tortious conduct.[11]

20        The Ninth Circuit uses a three-part test to analyze whether a party's "minimum

21   contacts" satisfy due process for the exercise of specific jurisdiction. *In re Antitrust Litig.*,

22   715 F.3d at 741–42. Under this three-part test, specific jurisdiction exists only if: (1) the

23   defendant purposefully availed himself of the privileges of conducting activities in the

24   forum, thereby invoking the benefits and protections of its laws, or purposely directed

25   conduct at the forum that had effects in the forum; (2) the claim arises out of the defendant's

26

27

28

---

[11] Plaintiffs do not argue that general jurisdiction exists here and purport to preserve any argument regarding general jurisdiction "should discovery show that any [individual] Defendant resides in Arizona." (Doc. 54 at 23 n. 5.)

forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable. *See id. citing Schwarzenegger*, 374 F.3d at 802.

### a. Purposeful Direction

In tort cases, the inquiry under the first part of the test—which is determinative in this case—is whether a defendant purposefully directed his activities at the forum state. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). The Ninth Circuit has the broadest effects test case law among the federal circuit courts, in part, due to its interpretation of *Calder v. Jones*, 465 U.S. 783 (1984) Under *Calder*, purposeful direction requires "the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (internal quotations and citations omitted).[12] Such action does not need to be pervasive but does need to establish a direct link between the defendant and the forum state. *See Ibrahim v. Dep't of Homeland Sec.,* 538 F.3d 1250, 1253 (9th Cir. 2008) (finding personal jurisdiction in California over a defendant, an employee of the Transportation Security Administration living and working in Washington, D.C., because he directly instructed San Francisco police via phone call to prevent the plaintiff from boarding her flight, detain her for questioning, and call the FBI); *Soler v. Cty. of San Diego*, 762 F. App'x 383, 385 (9th Cir. 2019) (exercising personal jurisdiction in California over two Arkansas Department of Corrections employees because they "specifically requested that California officials arrest and detain" the plaintiff).

In *Walden*, the Supreme Court considered whether the standard adopted in *Schwarzenegger* applies to intentional conduct by an individual acting outside the forum state. *See Walden*, 571 U.S. 277. Plaintiffs were traveling from Puerto Rico through Atlanta and transporting $97,000 in cash to Nevada. *Id.* at 280. Defendant Walden, a municipal officer deputized as a DEA agent at Atlanta's airport, seized plaintiffs' cash. *Id.* at 279. Plaintiffs alleged that they clearly conveyed to defendant that they were flying to and

---

[12] *Schwarzenegger* notes that purposeful direction test is more appropriate to tort cases but the purposeful availment test is most often used in contract suits. 374 F.3d at 802.

resided in Nevada. *Id.* at 280. The plaintiffs further alleged that defendant provided a false probable cause affidavit to assist in bringing a forfeiture action to obtain the funds. *Id.* at 280–81. Defendant challenged the District Court of Nevada's personal jurisdiction and the district court granted defendant's motion to dismiss. *Id.* at 281. On appeal, the Ninth Circuit reversed the district court, and after analyzing each of the prongs of the *Schwarzenegger* test, held that Nevada could exercise personal jurisdiction over defendant for that specific case. *See Fiore v. Walden*, 657 F.3d 838, 848–54 (9th Cir. 2011). The Ninth Circuit determined that the express aiming prong had been satisfied: "Walden expressly aimed his actions [in Atlanta] at people and property he knew from the outset were not local." *Id.* at 850. The Supreme Court accepted review and rejected the Ninth Circuit's reasoning that the defendants' "knowledge of [the plaintiffs'] strong forum connections," plus the "foreseeable harm" the plaintiffs suffered in the forum, satisfied the minimum contacts inquiry. *Walden*, 571 U.S. 289 (internal quotations omitted). The Court noted defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* Moreover, the Court rejected the Ninth Circuit's approach in *Walden* because it "impermissibly allow[ed] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections.") Thus, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. In sum, the intentional act must be personally directed at the forum state. *See id.* at 284 *citing Burger King*, 471 U.S. at 475 ("[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum State.") (internal quotation omitted).

National policy implementation, oversight, and regulatory work do not constitute such personal and express aim at a forum state and are therefore insufficient to support a finding of personal jurisdiction. *See Doe v. Am. Nat. Red Cross*, 112 F.3d 1048, 1051 (9th Cir. 1997) ("There was no reason for D[efendent], a government employee working and

living in the Washington, D.C. area, to believe that his role in the regulatory process would expose him to the power of the courts in Arizona."); *Oksner v. Blakey*, 347 F. App'x 290, 292 (9th Cir. 2009) (affirming district court's finding that it lacked jurisdiction over FAA administrators because "the mere fact that federal officials enforce federal laws and policies on a nationwide basis is not sufficient in and of itself to confer personal jurisdiction." *Oksner v. Blakey*, No. C 07-2273 SBA, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007)); *see also Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003) ("It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state."). As such, "personal jurisdiction cannot be based solely on a defendant's supervisory position, it must instead be shown that defendant 'personally took part in the activities giving rise to the action at issue.' " *Al-Kidd v. Gonzales*, No. CV:05-093-S-EJL, 2006 WL 5429570, at *3 (D. Idaho Sept. 27, 2006), *aff'd in part, rev'd in part sub nom. al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009), *rev'd and remanded*, 563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011), and *rev'd sub nom. Al-Kidd v. Ashcroft*, 653 F.3d 982 (9th Cir. 2011) (internal citations omitted).

*K.O. v. Sessions*, 436 F. Supp. 3d 442 (D. Mass. 2020), is similar to this case and illustrates this principle.[13] In *K.O.*, plaintiffs were all minor, non-United States citizen children who were forcibly separated from their parents in immigration detention facilities. *Id.* at 446. They brought suit in the United States District Court for the District of Massachusetts, through their parents, against high level government employees, including the former Attorney General, the Secretary of DHS, the White House Chief of Staff, and a Senior Advisor to the President, in their individual capacity. *Id* at 446-47. The Massachusetts long arm statute, Mass. Gen. L. ch. 223A § 3, permitted an exercise of personal jurisdiction to the fullest extent permitted by the Due Process Clause, and had

---

[13] The Massachusetts District Court did not find personal jurisdiction and transferred the case to the District Court for the District of Columbia ("D.C."). *K.O. v. Sessions*, 436 F. Supp. 3d at 454. The D.C. District Court reviewed the allegations and granted the individual defendants' motion to dismiss. *K.O. v. U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350, 358-59 (D.D.C. 2020).

similar requirements to those discussed above, including purposeful contact with the state.[14] *See id.* at 448-49. The court found that Plaintiffs "failed to point to any deliberate actions directed by any Defendant toward Massachusetts other than a few phone calls to E.O. [one of the plaintiffs] and other correspondence from unidentified personnel with E.O. regarding the status of his children, and the travel of unidentified federal personnel from Michigan to Massachusetts to deliver E.O. Jr. and K.O. to E.O." 436 F. Supp. 3d at 451. The alleged contacts with the state "for the most part were not engaged in by the Defendants themselves." *Id.* As such, the court found that it lacked personal jurisdiction over the individual defendants. *Id.*

Moreover, "the Ninth Circuit has not adopted a conspiracy theory of personal jurisdiction, and district courts within the Ninth Circuit have also rejected it." *Hilsenrath v. Equity Trust (Jersey) Ltd.*, 2008 WL 728902 *4 n. 5 (N.D.Cal. 2008). Importantly, other judges sitting on the District Court for the District of Arizona have rejected it. *Karsten Manufacturing Corp. v. United States Golf Ass'n*, 728 F.Supp. 1429, 1434 (D.Ariz.1990); *Stone v. Derosa*, No. CV 07-0680-PHXPGRCRP, 2009 WL 798930, at *3 (D. Ariz. Mar. 25, 2009).

### b. Defendants' Forum-Related Activities

The second prong of the specific jurisdiction inquiry requires that the claim arises out of the defendant's forum-related activities. The Ninth Circuit has adopted a "but for" standard which requires a "nexus between the cause of action and the defendant's activities in the forum*." Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *rev'd sub nom. on other grounds Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991). The nexus must be such that the cause of action would not have arisen without the contact between the defendant and forum state. *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th Cir. 1995).

---

[14] To exercise specific jurisdiction, Massachusetts required "'purposeful availment' which focuses on whether the Defendants had voluntary contacts with Massachusetts—the contacts must be deliberate and 'proximately result from the actions of the defendant himself' and 'must be of a nature that the defendant could reasonably anticipate being hailed into court' in Massachusetts." *K.O*, 436 F. Supp. 3d at 451.

### c. Fair Play and Substantial Justice

The final prong, that the exercise of jurisdiction comports with fair play and substantial justice, is a reasonableness standard. Once a plaintiff has made a sufficient showing on the first two prongs, the burden shifts to the defendant to make a compelling case that jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). In considering reasonableness, seven factors are weighed:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). These reasonableness factors may suggest that jurisdiction is proper where minimum contacts are otherwise insufficient, but the opposite is not true. *Burger King*, 471 U.S. at 477-488.

### 2. ANALYSIS

Plaintiffs contend that they have met their burden of demonstrating that the Court has jurisdiction over the Individual Defendants. Specifically, Plaintiffs allege Individual Defendants "purposefully directed tortious conduct at Arizona" and that "contacts of in-state agents and co-conspirators may be imputed to all Defendants." (Doc. 54 at 22.) The Individual Defendants counter that none of the allegations meet the standard because they did not actively nor personally direct any actions toward Arizona. (*See generally* Doc. 60 at 4–11.)

### a. Purposeful Direction

Under the *Calder* test, the Individual Defendants must have committed an intentional act expressly aimed at the forum state. The FAC's allegations largely fall within four categories: (1) harm caused by the child-separation policies and felt in Arizona; (2) the Defendants' policy enforcement functions; (3) actions imputed via conspiracy to the

1   Defendants; and (4) limited-but-direct contact with Arizona.

2          The first category largely includes allegations pertaining to the administrative tasks

3   necessary to plan the family separations. Specifically, the FAC alleges the Defendants

4   wrote a memorandum describing the separation plan, edited the memorandum, held

5   meetings to discuss the plan, and directed John and Jane Doe Defendants to separate

6   families at the southern border. (Doc. 54 at 24-25; Doc. 41 at 36-37.) These actions targeted

7   "the southern border, *including* Arizona." (*See e.g.* Doc. 54 at 24-25; Doc. 41 at 36-37.

8   (emphasis added)). Plaintiffs contend that this last action—directing agents to separate

9   families in states, including Arizona—satisfies the purposeful direction test and liken the

10  action to that taken in *Ibrahim* and *Soler*. This comparison is misplaced. In *Ibrahim* and

11  *Soler*, the out-of-state defendants each made a direct command to a specific actor in the

12  forum state to take a specific action against a specific plaintiff. Here, there is no such

13  directive alleged to have been given to a specific state actor by an Individual Defendant.

14  The FAC states that direction to separate families came "[t]hrough these meetings and other

15  directives in early 2018." This is different than the direct commands in *Ibrahim* and *Soler*.

16  *See Ibrahim*, 538 F.3d at 1253 (exercising personal jurisdiction over Defendant, an

17  employee of the Transportation Security Administration living and working in D.C.,

18  because he directly instructed San Francisco police via phone call to detain the plaintiff);

19  *Soler*, 762 F. App'x at 385 (exercising personal jurisdiction over two Defendants,

20  employees of the Arkansas Department of Corrections, because they "specifically

21  requested that California officials arrest and detain" the plaintiff). The FAC does not allege

22  the Individual Defendants personally separated parents and children or directed line-level

23  employees regarding how to carry out the family separation policy.

24         The Court is persuaded by the Massachusetts District Court's holding in the *K.O.*

25  case. Thirteen of the fifteen Individual Defendants are named in the *K.O.* complaint; each

26  is sued in their individual capacity for actions relating to familial separations.[15] The

27  ─────────────────────────────

28  [15] Jefferson Beauregard Sessions III- Attorney General of the United States (Doc. 41 at 8);
    Complaint at 5, *K.O.*, 436 F. Supp. 3d 442 (D. Mass. 2020) [hereinafter *K.O.* Complaint].
    Gene Hamilton- Counselor to the Attorney General (Doc. 41 at 8)); *K.O.* Complaint at 6.
    John F. Kelly- White House Chief of Staff and former Secretary of DHS (Doc. 41 at 9);

1   Massachusetts long arm statute and personal jurisdiction requirements are nearly identical
2   to the Arizona standard. Further the *K.O.* complaint, when evaluated by the D.C. District
3   Court, primarily asserted that the individual defendants "instituted a widespread practice
4   of separating migrant children from their parents" which was in place prior to a formal
5   announcement of a zero-tolerance policy, intended "to deter immigration to the United
6   States by instilling fear in migrants," and the implementation of the separation policy was
7   targeted based upon migrants' race or national origin. *K.O.*, 468 F. Supp. 3d at 358-59.
8   The plaintiffs in both cases allege the defendants instituted the practice of familial
9   separation to discourage Central American immigrants from entering the United States and
10  targeted families based upon race or national origin. *K.O.*, 468 F. Supp. at 358-59; Doc. 41
11  at 30, 58.

12          Here, the alleged actions involved policymaking decisions generally applicable to
13  border states, including Arizona. *See* Doc. 41 at 30 (discussions about implementing the
14  separation policy generally rather than discussions to target Arizona); *id.* at 32-33 (alleging
15  a pilot separation program but not in Arizona); *id.* at 34-36 (discussion and drafting of the
16  memorandum detailing border-wide separations); *id.* at 37-39 (implementation of criminal
17  prosecution for illegal entry pursuant to the zero-tolerance policy); *id.* at 40 (imposition of
18  and indifference to the conditions of confinement and allegations of mockery at a detention
19  facility—notably, not alleged to be an Arizona facility); *id.* at 42 (failure to direct staff to
20  facilitate communication between parents and children generally); *id.* at 43 (unnamed John
21  and Jane Doe Defendants alleged to broadly make misrepresentations to parents); *id.* at 44-
22  45 (failure to prepare for the influx of unaccompanied children). Ultimately, however, none

23  ────────────────────

24  *K.O.* Complaint at 5-6. Stephen Miller- Senior Advisor to the President (Doc. 41 at 9); *K.O.*
    Complaint at 6. Kirstjen Nielsen- Secretary of DHS (Doc 41 at 9); *K.O.* Complaint at 5.
25  Kevin K. McAleenan- Acting Secretary of DHS (Doc. 41 at 10); *K.O.* Complaint at 7.
    Thomas Homan- Acting Director of ICE (Doc. 41 at 10); *K.O.* Complaint at 6. Ronald D.
26  Vitiello- Acting Director of ICE (Doc. 41 at 10); *K.O.* Complaint at 6. L. Francis Cissna-
    Director of USCIS (Doc. 41 at 11); *K.O.* Complaint at 7. John/Jane Doe DHS Defendants-
27  employees of DHS and component agencies including CBP, and ICE (Doc. 41 at 11); *K.O.*
    Complaint at 7-8. Alex Azar- Secretary of the Department of Health and Human Services
28  (Doc. 41 at 12); *K.O.* Complaint at 7. E. Scott Lloyd- Director of ORR (Doc. 41 at 12);
    *K.O.* Complaint at 7. John/Jane Does- HHS/OOR employees (Doc. 41 at 12); *K.O.*
    Complaint at 8.

1    of the Individual Defendants are alleged to have implemented or carried out these national

2    policies on the ground in Arizona.

3          Further, the Individual Defendants were making national immigration policy.

4    Plaintiffs seem to take great care to avoid calling the familial separations a 'policy.' (*See*

5    *e.g.* Doc. 54 at 27 (calling the policy a "geographically targeted effort"); *id.* at 29 ("conduct

6    directing that immigrant families be separated at the border"); Doc. 41 at 37 ("'zero

7    tolerance' directive"); Doc. 41 at 39 ("following …approval of the 2018 Family Separating

8    Memo" rather than following the policy).) However, avoiding the word 'policy' does not

9    mean the Individual Defendants were not making national immigration policy. *See infra*

10   Part II.B.2.a.ii (characterizing claims as a challenge to federal policy). The Individual

11   Defendants drafted and edited policy memoranda, participated in policy discussions, and

12   directed other agencies to implement policy. Even if the above allegations could be

13   construed to directly target Arizona, the express aim prong fails because the alleged acts

14   implicate national policymaking. Like the defendant in *Doe v. Am. Nat. Red Cross*, the

15   Individual Defendants here were government employees working and living in the

16   Washington D.C. area who were making national policy decisions. *See* 112 F.3d at 1051.

17         Plaintiffs rely on *Oksner* to argue that because the policy was geographically

18   targeted to the southern border, the policy exception cannot apply. (Doc. 54 at 27.)

19   Plaintiffs are correct that the court in *Oksner* did not have personal jurisdiction because the

20   defendants there were implementing a nationwide regulation. However, the court's

21   decision did not turn on whether the policy was nationwide or regional. Rather, the *Oksner*

22   court noted that the FAA's enforcement of the Age 60 Rule[16] did not confer personal

23   jurisdiction over the federal agency officials because "if a federal agency head could be

24   sued personally in any district for merely performing official duties the minimum contacts

25   requirement would be rendered meaningless." *Oksner v. Blakey*, No. C 07-2273 SBA, 2007

26   WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007), aff'd, 347 F. App'x 290 (9th Cir. 2009)

27   (internal citations omitted; cleaned up). Although, the family separations were focused on

28   ───────────────
[16] The Age 60 Rule prevents individuals aged 60 and over from serving as a pilot on large
commercial aircraft.

1  the southern border states, including Arizona, the FAC demonstrates that the care and

2  custody of minor children occurred in states at and apart from the southern border, such as

3  New York and Florida. More generally, the immigration policy at issue here affected the

4  entire country because immigrants and asylum seekers who cross the southern border

5  eventually move on to other states and reside throughout the county.

6      Ultimately, Plaintiffs allege two specific actions directed at Arizona. First, the

7  Plaintiffs argue that "[m]ultiple Defendants, including Sessions and Nielsen, traveled to

8  Arizona in connection with these matters." As Defendants point out, this allegation is not

9  included in the complaint and Plaintiffs cannot amend their pleading through an opposition

10  brief. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998).

11  Nonetheless, the argument lacks merit.[17]

12      Second, plaintiffs assert that the "HHS/ORR Defendants, including Lloyd, rushed

13  to license more Arizona facilities to house the growing number of tender age children."

14  (Doc. 41 at 48.) The FAC lists Alex Azar, Margaret Wynne, E. Scott Lloyd, John/Jane Doe

15  as the HHS/OOR Defendants and defines "tender age" as 12 years old and under (Doc. 41

16  at 12, 45.) These were contacts in which the HHS/ORR Defendants availed themselves of

17  the benefits and protections of Arizona's laws. Therefore, this allegation is sufficient to

18  satisfy the purposeful direction prong of the *Calder* test, but only for the HHS/ORR

---

19  [17] The Court notes, that even if this allegation were in the FAC, it would not satisfy the
20  requirements of specific jurisdiction. First, it is doubtful whether these visits would satisfy
     the purposeful direction test because there were no direct actions taken toward Arizona or
21  agents in Arizona. Rather, as demonstrated by Plaintiffs' citation to media coverage, these
     were visits to publicly discuss the new administration's immigration policy. CBS NEWS,
22  *Attorney General Jeff Sessions speaks at U.S.-Mexico Border*, YOUTUBE at 2:30 (Apr. 11,
     2017), youtube.com/watch?v=NEN5u3HZHj4 ("Under the President's leadership and
23  through his Executive Orders, we will secure this border and bring the full weight of both
     the immigration courts and federal criminal enforcement to combat this attack on our
24  national security and sovereignty."); FOX BUSINESS, *DHS Secretary Nielson visits the
     Yuma Border Patrol Station*, YOUTUBE at 2:14 (Apr. 4, 2019),
25  youtube.com/watch?v=5UqN0zlsQFM ("We are now really at a point where this is not just
     a security and humanitarian crisis but really an emergency response."); ARIZONA PUBLIC
26  MEDIA, *CBP Commissioner Visit*, YOUTUBE at 1:14 (June 29, 2018),
     youtube.com/watch?v=y--RrT3nV6Y ("What I'm here to see is what additional resources
27  [border officers] need to be even more effective."). Second, even if these Arizona visits
     were sufficient to satisfy the *Calder* test, the specific jurisdiction inquiry would fail on the
28  second prong—the Defendants' forum related activities—because the Ninth Circuit's "but
     for" test is not met since there is no showing that the Plaintiffs would not have suffered the
     claimed harms but for the Arizona visits. *See supra* Part II.A.1.B (detailing the standard).

1    Defendants.

2          Plaintiffs state that the Court should impute these contacts to all Defendants and
3    "co-conspirators." (Doc.54 at 27.) But the cases Plaintiffs cite for this proposition involve
4    a direct link between the out-of-state defendant and an in-state agent or actor. *See Ochoa*
5    *v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1186, 1190 (9th Cir. 2002) (exercising
6    personal jurisdiction in Arizona over New York defendant who ordered a recruiter to find
7    available farmworkers and dictated the recruiter's timing of such recruitment in Arizona
8    and transportation from Arizona to New York); *Myers v. Bennett L. Offs.*, 238 F.3d 1068,
9    1071, 1073-74 (9th Cir. 2001) (exercising personal jurisdiction in Nevada over a Utah
10   corporation with is principal place of business in Utah after an employee of the corporation
11   improperly ordered a credit report, using the corporation's order forms, about Nevada
12   residents); *Biliack v. Paul Revere Life Ins. Co.*, 265 F. Supp. 3d 1003, 1008-09 (D. Ariz.
13   2017) (exercising personal jurisdiction in Arizona over defendants living in Tennessee and
14   Massachusetts employed by an insurance company where the defendants directly contacted
15   plaintiff's Arizona doctors to influence them to support the denial of plaintiff's disability
16   claims); *Stadt v. Univ. of Rochester*, 921 F. Supp. 1023, 1026 (W.D.N.Y. 1996) (exercising
17   personal jurisdiction in New York over an out-of-state defendant where the defendant
18   ordered medical staff to inject research participants with plutonium as part of a research
19   study in New York). Without such a direct link or order, it cannot be said that the
20   HHS/OOR Defendants were agents of the other Defendants. Thus, the HHS/OOR
21   Defendants' contact with Arizona cannot be imputed to the remaining Individual
22   Defendants. The Ninth Circuit has not adopted, and Arizona has rejected conspiracy
23   theories of personal jurisdiction.

24         Since only the HHS/OOR Defendants licensing of Arizona facilities has met the
25   first two prongs of the *Calder* test, only these allegations are evaluated under the third
26   prong which requires that the defendant knows the harm is likely to be suffered in the forum
27   state. *Schwarzenegger*, 374 F.3d at 803. Because the HHS/OOR Defendants licensed
28   facilities in Arizona specifically to house tender aged children separated from their parents

at the border, it can be inferred that they were aware the harm would be suffered in Arizona. As a whole, only the HHS/OOR Defendants engaged in conduct that connected them to Arizona and this litigation in a meaningful way.

### b. Defendants' Forum-Related Activities

The HHS/OOR Defendants' forum-related activities, here, the licensing of tender age facilities in Arizona, must meet the Ninth Circuit's "but for" standard which requires a nexus between the licensing of these facilities and the harm alleged.

There are three ways that the licensing of extra tender age facilities fail but-for causation. First, one child, K.E.O.H., was not of tender age and so it cannot be said that her harm would not have occurred but for the extra tender age facilities licensed in Arizona. (Doc. 41 at 2 (K.E.O.H. was 13 years old at the time of separation).)

Second, most of the children who were of tender age were not detained long-term in Arizona. Therefore, the licensing and availability of extra tender age facilities did not cause their harm.  (Doc. 41 at 2, 17-19 (J.A.H.I. and M.E.H.I. were 7 and 8 years old and spent four days in a CBP processing center near Eloy, Arizona before being moved to a shelter in Miami, Florida); *id.* at 4, 27 (B.L.S.P. was 3 years old at the time of separation and after two days was moved to New York before returning to Guatemala); *id.* at 3, 28 (A.E.P.F. was 6 years old and placed with a foster family in New York); Doc. 53 at 43 (indicating A.E.P.F. was apprehended and separated from his father in Texas.)

Finally, only one child, D.S.V.H. (aged 7), was housed in two Southwest Key tender age facilities in Arizona. (Doc. 41 at 2, 24-25, 48). However, there were already two tender age facilities in Arizona before the licensing of the new facilities. (Doc. 41 at 48.)  There is no showing that D.S.V.H. would not have been separated from her father and housed at either of the two previously licensed facilities. And, as shown by the experience of the majority of the child Plaintiffs, children were often sent out of state to be housed in facilities rather than in Arizona. In other words, there is no showing that but for the extra Arizona tender age facilities, D.S.V.H. would not have been separated from her father.

### c.  Fair Play and Substantial Justice

The third prong is only addressed after a plaintiff has made a sufficient showing on the first two prongs. *Burger King*, 471 U.S. at 476. That is not the case here. As such, the Court will not address the third prong.

## 3.   LEAVE TO CONDUCT DISCOVERY

"A district court has discretion to permit or deny jurisdictional discovery." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008). "Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* Jurisdictional discovery may be denied "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants ...." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (quotation omitted).

Here, Plaintiffs have asked for leave to conduct jurisdictional discovery to establish contact with the forum. (Doc. 54 at 25.) Jurisdictional discovery is unnecessary. Because the allegations in the FAC have failed to make a prima facie showing of purposeful direction and a "but for" connection between the allegations and harm, "it is wholly speculative that discovery will lead to evidence necessary to establish general jurisdiction." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) ("The denial of [the plaintiff's] request for discovery, which was based on little more than a hunch that it might yield jurisdictionally relevant facts, was not an abuse of discretion."). "Whether the Court may exercise specific jurisdiction over these Defendants will depend on whether Plaintiffs can allege forum-related activity giving rise to their claims. Jurisdictional discovery is not necessary to accomplish this task." *Perez v. United States*, No. 13CV1417-WQH-BGS, 2014 WL 4385473, at *8–9 (S.D. Cal. Sept. 3, 2014).

## B.  FAILURE TO STATE A CLAIM

## 1.  LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This provides a defendant with "fair notice" of the claims against it and the grounds for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (internal quotations and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) if the complaint does not contain enough facts to state a claim that is plausible on its face. *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' [for] his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted). In considering a motion to dismiss, a court must accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id*. at 550.

## 2.  CONSTITUTIONAL CLAIMS

### a.  *Bivens* Analysis

In *Bivens*, the Supreme Court recognized an implied cause of action for damages for persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. 403 U.S. at 397. In the years following *Bivens*, the Court recognized implied rights of action in two other contexts. *See Davis v. Passman*, 442 U.S. 228 (1979) (recognizing a damages remedy for a gender discrimination claim against a United States Congressman under the equal protection component of the Fifth Amendment Due Process Clause); *Carlson v. Green*, 446 U.S. 14 (1980) (recognizing a damages remedy against federal prison officials for failure to provide adequate medical treatment under the Eighth Amendment's Cruel and Unusual Punishment Clause).

Since *Carlson* was decided in 1980, however, the Supreme Court has repeatedly refused to expand the *Bivens* remedy into a new context or category of defendants. *See Hernandez v. Mesa*, 140 S. Ct. 735, 742–43 (2020) (collecting cases). Recently, the Court advised that it is "reluctant to create new causes of action" in constitutional cases, because "Congress is best positioned to evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government' based on constitutional torts." *Hernandez*, 140 S. Ct. at 742 *quoting Abbasi*, 137 S. Ct. at 1857.

In considering possible extensions of *Bivens*, a court must engage in a "two-step inquiry." *Hernandez*, 140 S. Ct. at 743. The court must first inquire whether the request involves a claim that arises in a new context or involves a new category of defendants. *Id.* (citation and quotation omitted). A context is new if "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017). As explained in *Abbasi*:

> Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60. This list is not exhaustive, and the "new-context inquiry is easily satisfied." *Id.* at 1865.

If a court determines the plaintiffs' allegations extend *Bivens* liability into a new context or category of defendants, the court must "proceed to the next step and ask whether there are factors that counsel hesitation" in granting a *Bivens* remedy. *Hernandez*, 140 S. Ct. at 744. Such factors can include separation of powers principles, national security, the

1  availability of other remedies for the alleged wrong, and substantial costs imposed on the

2  government. *Hernandez*, 140 S. Ct. at 747–49. This inquiry must also concentrate on

3  "whether the Judiciary is well suited, absent congressional action or instruction, to consider

4  and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S.

5  Ct. at 1857–58. The most important question guiding this analysis is, "who should decide

6  whether to provide for a damages remedy, Congress or the courts?" *Id.* at 750 (internal

7  quotation marks and citation omitted).

8  <center>**i.  New Context**</center>

9       In determining whether the asserted context is "different in a meaningful way from

10  previous *Bivens* cases decided by [the Supreme] Court," *Abbasi*, 137 S. Ct. at 1859, it is

11  insufficient that the asserted claim arises under the same broad constitutional provision

12  where the context is otherwise meaningfully different. *See Hernandez v. Mesa*, 140 S. Ct.

13  735, 743 (2020). Even a single "modest" departure from a previously approved *Bivens*

14  claim suffices to create a new context. *See Abbasi*, 137 S. Ct. at 1864.

15       The Individual Defendants here are high-level officials in the Executive Branch.

16  Under *Bivens*, "each Government official, his or her title notwithstanding, is only liable for

17  his or her own misconduct." *Iqbal*, 556 U.S at 677. "[T]he Supreme Court acknowledged

18  that *Bivens* claims cannot proceed on a theory of respondeat superior, but must instead

19  plead that a supervisor, by her 'own individual actions,' violated the Constitution." *Chavez*

20  *v. United States*, 683 F.3d 1102, 1109 (9th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 676).

21  "*Bivens* is not designed to hold officers responsible for acts of their subordinates[;]" its

22  purpose is rather to "deter the officer." *Abbasi*, 137 S. Ct. at 1860 (internal quotation marks

23  and citation omitted). Similarly, in evaluating supervisory liability under a section 1983

24  claim, the Ninth Circuit has explained that "[a]n official may be liable as a supervisor only

25  if either (1) he or she was personally involved in the constitutional deprivation, or (2) a

26  sufficient causal connection exists 'between the supervisor's wrongful conduct and the

27  constitutional violation.'" *Felarca v. Birgeneau*, 891 F.3d 809, 819–20 (9th Cir. 2018)

28  (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)).

<center>- 24 -</center>

In Count VI, Plaintiffs allege violations of the Fourth Amendment. (*See* FAC ¶¶ 329–38.) Plaintiffs offer several Ninth Circuit cases in support of an implied damages remedy for an unconstitutional search or seizure under the Fourth Amendment. *See Brunoehler v. Tarwater*, 743 Fed. App'x 740, 743 (9th Cir. 2018) (finding no new context where plaintiff alleged that agents "arrested him in his home without probable cause"); *Ioane v. Hodges*, 939 F.3d 945, 952 (9th Cir. 2018) (finding no new context where plaintiff alleged that Internal Revenue Service conducted a warrantless search of her person); and *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012) (finding no new context where plaintiffs alleged that Border Patrol agents repeatedly stopped their vehicle without reasonable suspicion).

The cases offered by Plaintiffs are distinguishable. Here, the FAC does not allege the Individual Defendants directly participated in the "hands-on" actions that give rise to Plaintiffs' claims or were personally involved in any particular Fourth Amendment violation. *See Felarca*, 891 F.3d at 819–20. Rather, the FAC alleges that the Individual Defendants "planned, conducted, acquiesced to, or were willfully blind" to

> "the manner in which Plaintiffs and Class Members were seized through the use of threats, coercion, duress, and the use of false information," and "the failure to create or implement a plan for reunification of separated parents and children, including failing to properly track personal identifying information[.]"

(FAC ¶¶ 334–35.) The FAC does not allege that Individual Defendants directed, ordered, or participated directly in the alleged Fourth Amendment violations. Rather, the FAC imputes knowledge or attributes omissions to high-level policy makers. *See id.* Accordingly, the Fourth Amendment claims against the Individual Defendants implicate a new and meaningfully different *Bivens* context.

Plaintiffs' claims based on the Fifth Amendment also present a new context. Plaintiffs allege five distinct Fifth Amendment violations: (1) the right to family integrity

in Count I; (2) the right to receive adequate medical care in Count II; (3) the right to be free from punitive treatment in Count III; (4) the right to procedural due process in Count IV; and (5) the right to equal protection in Count V. (FAC ¶¶ 282–92; 293–302; 303–11; 312–19; 320–28.) Plaintiffs insist "*Bivens* remedies have long been available under the Fifth Amendment." (*See* Doc. 54 at 33.)

The Due Process Clause guarantees two types of due process: procedural and substantive. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Procedural due process provides "a guarantee of fair procedure in connection with any deprivation of life, liberty, or property" by the government. *Id.* Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Id.* (internal quotation omitted). Despite Plaintiffs' assertions to the contrary, the specific constitutional rights at issue are meaningfully different from that contemplated in *Davis*, which considered only the equal protection component of the Fifth Amendment Due Process Clause. Here, the alleged violations include both substantive and procedural due process claims in the immigration context under the Fifth Amendment.

Plaintiffs cite several cases for the proposition that the Ninth Circuit recognizes *Bivens* remedies in the immigration context, but those cases are factually and legally dissimilar. *See e.g., Papa v. United States*, 281 F.3d 1004 (9th Cir. 2002) (holding that a non-citizen could bring a *Bivens* action where an alien was killed by another alien as a direct result of line-level guards who knowingly placed decedent in an exercise yard with a known gang member); *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018) (finding a *Bivens* remedy available where a federal immigration prosecutor submitted falsified evidence in order to deprive [the plaintiff] of his right to apply for lawful permanent residence); *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986) (holding a *Bivens* remedy available where an INS agent "conducts a search or makes an arrest without knowledge of the details of the warrant under which he presumes to act[.]"). None of the cases Plaintiffs cite involve high-ranking executive officials engaged in policy making. Instead, each case involves line-level

1    defendants who had direct contact with the plaintiffs and were personally involved in the

2    unlawful conduct. Accordingly, Plaintiffs' Fifth Amendment claims present a new *Bivens*

3    context.

### ii.  Special Factors

5           The second inquiry is whether there are "special factors that counsel hesitation about

6    granting the extension." *Hernandez*, 140 S. Ct. at 743 (internal quotation marks and citation

7    omitted). If there are "special factors," the Supreme Court has made "clear that a *Bivens*

8    remedy will not be available ... in the absence of affirmative action by Congress." *Abbasi*,

9    137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). The Supreme Court has not defined

10   "special factors," but it has offered some examples, including: congressional silence in a

11   heavily legislated area; the existence of an alternative remedial structure; national security

12   considerations; and whether the claims address individual conduct or broad policy. *Id.* at

13   1856–63.

14          As a threshold matter, Plaintiffs contend that they do not seek to attack broad federal

15   policy, but rather individualized conduct. (Doc. 54 at 41 ("Plaintiffs do not allege that they

16   are challenging a 'policy' as opposed to egregious individual actions in violation of federal

17   law and the Constitution.").) In so doing, Plaintiffs attempt to distinguish this case—

18   arguing the instant claims are not a direct challenge to the zero tolerance policy or any

19   policy—from other similar district court decisions that have declined *Bivens* claims. *See*

20   *K.O.*, 468 F. Supp. 3d at 363 (declining to extend *Bivens* claims against eleven of the same

21   individual defendants as here); *Mejia-Mejia v. U.S. Immigr. & Customs Enf't*, No. CV 18-

22   1445 (PLF), 2019 WL 4707150, at *4 (D.D.C. Sept. 26, 2019) (declining to extend *Bivens*

23   claims against two of the same individual defendants as here); *Pena Arita v. United States*,

24   470 F. Supp. 3d 663, 694 (S.D. Tex. 2020) (declining to extend *Bivens* claims against line-

25   level individual defendants). Because administrative officials previously denied the

26   existence of a family separation policy, Plaintiffs seemingly suggest that the Individual

27   Defendants conduct here is separate and distinct from the actions of high-level officials

28   acting pursuant to policy for purposes of *Bivens*. (*See* Doc. 54 at 41.)  The Court disagrees.

To start, Plaintiffs themselves allege that "Defendants include the United States of America and those U.S. government officials who ordered or participated in the planning of widespread family separations." (*See* FAC at ¶ 9.)  Plaintiffs also allege individual conduct which seems to involve the formulation and concerted implementation of a national policy involving several executive offices.[18] The claims here are based on allegations that named high-ranking executive officials created, and had others execute, a national policy that precipitated the unconstitutional separation of families by unnamed line-level defendants. Thus, the nature and substance of the claims implicate broad national policy.

Because *Bivens* is not a "proper" vehicle for altering an entity's policy, this challenge to broad policy counsels hesitation in granting a *Bivens* extension.  *See Abbasi*, 137 S. Ct. at 1852–53, 1860–63 (refusing to extend a *Bivens* remedy to plaintiffs' claims against former Attorney General John Ashcroft, former FBI Director Robert Mueller, and former Immigration and Naturalization Service Commissioner James Ziglar brought by persons detained pursuant to a post-September 11 "hold-until-cleared" national security policy in part because a *Bivens* action is not a "proper vehicle for altering an entity's

---

[18] *See, e.g.,* FAC ¶ 27 ("[Defendant Sessions] oversaw the administration of the immigration laws, including by overseeing the Executive Office for Immigration Review[].");  *id.* ¶ 28 ("[Defendant Hamilton] advised Sessions on immigration policy and practice.");  *id.* ¶ 29 ("[A]s Chief of Staff, [Defendant] Kelly advised President Trump on all aspects of immigration policy and practice, including the detention of asylum seekers and forcible separation of children and parents");  *id.* ¶ 30 ("[Defendant Miller] advises President Trump on immigration–including the detention of asylum seekers and forcible separation of children and parents.");  *id.* ¶ 31 ("[Defendant Nielsen] oversaw enforcement of the immigration laws, and directed all DHS component agencies, including ICE and CBP.");  *id.* ¶ 32 ("[Defendant McAleenan] had direct authority over all CBP procedures and practices relating to CBP immigration enforcement operations and facilities….");  *id.* ¶¶ 135–40 (alleging the creation of a "pilot program" that resulted in the separation of hundreds of children);  *id.* ¶¶ 147–56 (alleging an agreement "to pursue separation of families entering the United States at all points across the southern border");  *id.* ¶¶ 160–62 (alleging that the Zero-Tolerance policy of prosecuting anyone who violated 8 U.S.C. § 1325(a) along the southern border was a pretext for "widespread separations");  *id.* ¶ 167 (alleging that "the government began to separate parents and children at substantially increased rates and in substantially increased numbers") (emphasis added);  *id.* ¶¶ 168–69 (alleging that the separations were effected by "John/Jane Doe DHS Defendants");  *id.* ¶ 290 ("The Individual Defendants have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the clearly established Fifth Amendment due process rights of Plaintiffs and Class Members . . . .").

policy") (quotation marks and citation omitted); *see also Mejia-Mejia v. U.S. Immigr. & Customs Enf't*, No. 18-1445 (PLF), 2019 WL 4707150, at *3–6 (D.D.C. Sept. 26, 2019) (dismissing plaintiff's *Bivens* action against former Attorney General Jeff Sessions and former director of [ORR] Scott Lloyd, which challenged the decision to forcibly separate the plaintiff from her son during their pre-asylum detention pursuant to the Executive Branch's "[z]ero [t]olerance" immigration policy, because it amounted to a "collateral challenge to a government-wide policy").

The parties also disagree whether Plaintiffs have "alternative, existing process[es]" to protect their interests if there is no *Bivens* remedy. *Abassi*, 137 S. Ct. at 1858. In *Abbasi*, the Court found that congressional silence, in conjunction with the plaintiffs' ability to challenge the conditions of their confinement through a successful habeas petition, indicated that Congress intended for plaintiffs to use other remedies to obtain relief. *Id.* at 1862–63. Individual Defendants contend that Plaintiffs could seek injunctive or declaratory relief, relief under the Administrative Procedures Act, relief pursuant to the Federal Tort Claims Act ("FTCA"), or relief through state tort claims. (Doc. 53 at 26–29.) In response, Plaintiffs contend that those proposed remedies are inadequate and argue that the FTCA is a parallel and complementary cause of action which does not bar *Bivens* relief, Congress has foreclosed state tort claims brought against federal employees, injunctive or declaratory relief cannot compensate or redress past wrongs, and the APA is inapplicable to the instant claims. (Doc. 54 at 37–40.)

Here, Plaintiffs have pursued claims under the FTCA. The FTCA on its own does not suffice as an alternative form of relief because it does not afford comparable deterrence and compensation options. *Quintero Perez v. United States*, 8 F.4th 1095, 1105 (9th Cir. 2021). While this may be so, the lack of an adequate alternative remedy is not dispositive in determining whether a *Bivens* action to award money damages against individual government actors is appropriate. *Quintero Perez*, 8 F.4th at 1105 (citing *Schweiker v. Chilicky*, 487 U.S. 412, 421–22 (1988)). Rather, the Court must consider whether special factors taken as a whole counsel against a remedy. *Id.*

### iii.  Other Factors

In addition to asserting that *Bivens* is not properly used as a means of challenging general government policies, Individual Defendants further argue that Plaintiffs' claims implicate additional distinct factors which counsel hesitation, including: congressional action in the context of immigration; national and border security concerns; separation-of-powers issues inherit in challenging high-level Executive Branch policy; separation-of-powers issues inherit in challenging the Executive's enforcement of laws; and the unworkability that would result from implying a *Bivens* remedy. (Doc. 52 at 29–43.) The Court finds particularly persuasive three of the proposed special factors.

First, Individual Defendants identify fifteen statutes and note instances of non-legislative activity which purportedly show congressional action in the context of immigration.[19]  Plaintiffs argue that only two of the identified statutes were enacted after the separations, and that none of the examples cited by Defendants support an "explicit congressional declaration" barring a *Bivens* remedy. (Doc. 54 at 44–45.) This argument is unavailing. An "explicit congressional declaration" would be an independent ground for declining to extend *Bivens* but is not necessary for the 'special factors' analysis to prevent extension for other reasons. *See Spagnola v. Mathis*, 859 F.2d 223, 229 n.10 (D.C. Cir. 1988) (noting that the lack of an "explicit congressional declaration" "has little relevance to the "special factors" exception") (internal citation omitted). It is enough that congressional action has been frequent and intense, and Congress has not created a damages remedy. *Abbasi*, 137 S. Ct. at 1862 (internal quotation omitted). Further, the Court is persuaded that, even if limited to the two separate statutes enacted after the separations, this alone demonstrates sufficient congressional action. Moreover, similar to *Abbasi*, at Congress' behest and on their own initiative, the Inspectors General of multiple departments have compiled reports on the family separation practices resulting from the zero tolerance policy. (*See* FAC ¶¶ 16, 196.) Congress is better equipped to decide whether

---

[19] Defendants identify the U.S.C. § 1101 et seq. ("INA"), Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2165 (2002) ("HSA"), William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (2008), and 12 statutes addressing trafficking victims. (*See* Doc. 52 at 31 n. 17.)

to permit a damages remedy here. *See* Ziglar, 137 S. Ct. at 1865.

Next, the Supreme Court has cautioned against recognizing claims involving high-level officials due to the "risk of interfering with the authority of the other branches." *Hernandez*, 140 S. Ct. at 743. Likewise, in *Abbasi* the Court noted that such claims "call into question the formulation and implementation of a general policy[,]" and expressed serious concerns about the "burden and demand of litigation" and the potential for "inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged." *Abbasi* at 1860. Such consequences, explained the Court, "counsel against allowing *Bivens* actions against … Executive Officials" who could be prevented "from devoting the time and effort required for the proper discharge of their duties." *Id.* (citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004) (noting "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from … its constitutional duties")); *see also Lanuza v. Love*, 899 F.3d 1019, 1029 (9th Cir. 2018) (quoting *Abbasi*, 137 S. Ct. at 1849 ("*Bivens* actions against high-ranking executive officers, such as the Director of the Federal Bureau of Investigation and the U.S. Attorney General in Abbasi, are disfavored because such suits 'would call into question the formulation and implementation of a high-level executive policy, and the burdens of that litigation could prevent officials from properly discharging their duties.'").) Prosecution of these claims would call into question the formulation and implementation of a high-level executive policy and although many of the allegations involve communications between *former* high-ranking officials, the threat of discovery could diminish the Executive's autonomy and confidentiality. *Cheney*, 542 U.S. at 385. Further, allowing a *Bivens* claim here could lead to actual "discovery and litigation" that could "implicate the discussions and deliberations that led to the formation of the policy" and "inhibit the free flow of advice … and expression of opinion within an agency"—all of which constitute "special factors that counsel against" allowing Plaintiffs' *Bivens* claims to proceed. *Abbasi*, 137 S. Ct. at 1861 (internal quotation omitted).

Defendants also assert separation-of-powers concerns inherent in challenging the

Executive Branch's enforcement of laws. Specifically, Defendants contend that acting through the Executive Branch, Defendants implemented a policy of criminally prosecuting all DHS referrals of Section 1325(a) violations as contemplated by Congress, 8 U.S.C. §1325(a), and the powers granted by the Constitution. (Doc. 52 at 40.) Other family separation cases have found the exercise of prosecutorial discretion to be a factor counseling hesitation. *See K.O.*, 2020 WL 3429697, at *10 (recognizing as a special factor that the suit "concerns the exercise of prosecutorial discretion by the Attorney General"); *see also Mejia-Mejia*, 2019 WL 4707150, at *5 (same).

For the reasons stated above, the Court declines to extend *Bivens* into this new context and will dismiss Counts I through VI. Because the *Bivens* claims will be dismissed, there is no reason to address Defendants' qualified or absolute immunity arguments with respect to the constitutional claims. *See Clark*, 2021 WL 2386115, at *5 (declining to reach the issue of qualified immunity after dismissing the plaintiffs' *Bivens* claims).

### 3. CONSPIRACY CLAIMS

In Count VII Plaintiffs allege that certain Individual Defendants conspired to deprive Plaintiffs of their rights under the Fourth and Fifth Amendment, in violation of 42 U.S.C. § 1985(3). (FAC ¶¶ 339–44.) Plaintiffs also allege, in Count VIII, that the named Individual Defendants had knowledge of the conspiracy and failed to prevent it in violation of 42 U.S.C. § 1986. (FAC ¶¶ 345–49.) Defendants argue *inter alia* that they are entitled to qualified immunity from liability because Plaintiffs' statutory claims are barred by the intracorporate conspiracy doctrine. (Doc. 52 at 62). Under the intracorporate conspiracy doctrine "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Abbasi*, 137 S. Ct. at 1867. In Response, Plaintiffs argue that the doctrine does not apply to civil rights claims and, even if it did, the Defendants are employees from *different* government agencies, and thus cannot be said to be part of the same legal entity. (Doc. 54 at 68 (emphasis added).)

At the times Plaintiffs allege the Individual Defendants conspired, it was unsettled law whether an intracorporate agreement could subject federal officials, from different

agencies within the Executive Branch, to liability for civil rights violations under § 1985(3). As such, qualified immunity applies and bars the § 1985(3) claim. Furthermore, without a valid cause of action under § 1985, Plaintiffs' § 1986 claim cannot survive. *See Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) ("A claim can be stated under section 1986 only if the complaint contains a valid claim under section 1985(3).")).

"Qualified immunity protects public officials from a court action unless their conduct violated a constitutional right that was clearly established at the time." *Felarca v. Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018) (citing *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015)). To determine whether officials are entitled to qualified immunity a Court must answer two questions: (1) whether the facts, taken in the light most favorable to the non-moving party, show that the officials' conduct violated a constitutional right, and (2) whether the law at the time of the challenged conduct clearly established that the conduct was unlawful. *Felarca*, 891 F.3d at 815 (internal citation and quotation omitted). To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent supported by "controlling authority" or "a robust consensus of cases of persuasive authority." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). The court may address the steps in either order. *Id.* at 815-16 (internal citation omitted). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020) (internal citation and quotation omitted).

The Ninth Circuit has not decided whether the intracorporate conspiracy doctrine applies to civil rights actions. *See, e.g., Fazaga v. FBI*, 965 F.3d 1015, 1060 & n.41 (9th Cir. 2020) (qualified immunity barred claim because there is no clearly established Ninth Circuit law on whether "an intracorporate agreement could subject federal officials to liability under § 1985(3)"), *reversed on other grounds by Fed. Bureau of Investigation v. Fazaga*, 142 S. Ct. 1051 (2022). Nonetheless, "district courts within this Circuit that have addressed the issue consistently have held that it does apply, including this Court."

*Hasbrouck v. Yavapai Cty.*, No. CV-20-08112-PCT-DWL, 2021 WL 321894, at *15 (D. Ariz. Feb. 1, 2021) (quoting *Norton v. Arpaio*, No. CV-15-00087-PHX-SPL, 2015 WL 13759956, at *5 (D. Ariz. Nov. 20, 2015) (collecting cases)); *see also Manansingh v. United States*, No. 2:20-CV-01139-DWM, 2021 WL 2080190, at *6 (D. Nev. May 24, 2021) ("Even if the claim was timely, however, the Probation Defendants are entitled to qualified immunity because the law is not 'clearly established' regarding the application of the intracorporate conspiracy doctrine.")

The parties disagree as to whether the application of the intracorporate conspiracy doctrine is limited to employees of a single government agency, as Plaintiffs assert, or, whether, as Defendants contend, the doctrine applies to officials within the same Executive Branch of government across multiple agencies. (Doc. 52 at 62; Doc. 54 at 69.) By way of analogy, Defendants offer numerous district court cases where the intracorporate conspiracy doctrine barred claims involving interdepartmental and interagency claims among and between multiple state, city, and local governments. (*See* Doc. 61 at 29 n. 29 (collecting cases).) Conversely, Plaintiffs cite two unpublished district court opinions—*Ali v. Raleigh Cty.*, No. 5:17-cv-3386, 2018 WL 4101517, at *11 (S.D.W. Va. Aug. 28, 2018) and *Bailey v. Pataki*, No. 1:08-cv-8563, 2010 WL 4237071, at *5 (S.D.N.Y. Oct. 26, 2010)—for the proposition that the intracorporate conspiracy doctrine does not apply "in cases involving multiple federal agencies." (Doc. 54 at 72.) One of the cases is distinguishable as it involved unauthorized conduct, whereas here, the FAC alleges that Defendants acted "within the scope of their office or employment." *See* FAC ¶ 26; *Ali*, 2018 WL 4101517, at *11 ("Thus, even if the [Unit] could be considered one legal entity for the purposes of the intracorporate conspiracy doctrine, the Defendant's actions were not authorized and would fall into an exception of that doctrine."). As to the other opinion, even if the Court found *Bailey* persuasive, Plaintiffs have failed to show a "robust consensus of persuasive authority." *See Wesby*, 138 S. Ct. at 589.

Because the law is not "clearly established" regarding the intracorporate conspiracy doctrine's applicability to a federal official's liability for civil rights violations or to the

- 34 -

scope of federal officials acting across multiple agencies, the Individual Defendants are entitled to qualified immunity. Accordingly, Counts VII and VIII are dismissed.

### III.   LEAVE TO AMEND

The Court finds that it lacks personal jurisdiction over the Individual Defendants, Plaintiffs fail to state a cognizable *Bivens* claim against the Individual Defendants, and qualified immunity bars the Plaintiffs' statutory claims. Having broadly construed and assumed the truth of the allegations, the Court is persuaded that there is no basis for concluding that Plaintiffs' claims can be saved through amendment of the complaint. *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (explaining that a court may exercise its discretion and deny leave to amend when it is clear that the plaintiffs cannot allege any set of facts that would entitle them to relief). Accordingly, the claims in the FAC against the Individual Defendants are dismissed without leave to amend.

### IV.   ORDER

Accordingly,

**IT IS ORDERED GRANTING** Defendants' Motion to Dismiss. (Doc. 52.) Counts I–VIII are **DISMISSED WITHOUT LEAVE TO AMEND** and the Individual Defendants, listed above in footnote one, are dismissed from this action.

Dated this 31st day of March, 2022.

_____
Honorable John C. Hinderaker
United States District Judge