**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| J.J.P.B., *on behalf of himself and on behalf of* | § | |
| *his minor child*, A.E.P.F., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 7:23-cv-00133 |
| | § | |
| United States of America, | § | **AMENDED COMPLAINT** |
| | § | |
| Defendant. | § | |

## INTRODUCTION

1.     This action seeks damages on behalf of an immigrant father and son who were cruelly and inhumanely separated from each other by the U.S. government as part of the government's Zero Tolerance practice of deliberately inflicting cruelty upon families at the border.

2.     Since 2017, thousands of children, including many two years old or younger, have been torn from their parents' arms with little or no warning.  In many cases, no explanations were given as to why they were being separated, and no answers were provided as to where the children were being taken.  Often, no information was given to either the child or parent about each other's whereabouts.  The separated children and parents were not told when—or even *if*—they would ever see each other again.  Many did not see each other again for a year or more.

3.     Plaintiff A.E.P.F. ("Andrés"), then six years old, was torn kicking and screaming from the arms of his father, Plaintiff J.J.P.B. ("Jacinto"), as Jacinto tried in vain to make uninterested guards, who not only ignored Jacinto's pleas but openly mocked and taunted him,

aware of Andrés' heart murmur.[1]  Guards told Jacinto that his son now "belonged to Trump." Jacinto was deported without Andrés, and Andrés did not see his father again for nearly ten months.

4.      Before 2017, family separations at a U.S. border were exceedingly rare, and based on either a parent's medical emergency or a determination that the parent represented a danger to the child.  Beginning in or around mid-2017, however, the U.S. government violated the law and ordered these forcible family separations in Texas and elsewhere along the southern border.

5.      Defendant the United States of America ordered or participated in the planning of widespread family separations.  It did so unlawfully, for no legitimate reason, and notwithstanding that family separation does irreparable psychological and physical damage to children and parents. Defendant destroyed families to inflict severe pain on Central American immigrants, hoping that this would cause them to abandon their asylum cases and deter other Central Americans from seeking asylum or other immigration relief in the United States.   It took these actions for the purpose of intentionally inflicting emotional distress on the thousands of parents and children they separated, including Plaintiffs.

6.      The separated children, after being taken from their parents, were detained in punitive conditions, which included being provided no means of communication with their parents for weeks or even months.  During this period, parents had no idea how their children were being cared for, or by whom.  Some parents contemplated or attempted suicide, and at least one tragically died by suicide.  Traumatized children were not provided any meaningful treatment to address the fear, isolation, and abandonment they experienced or the lasting effects of their separation and confinement.

---

[1]   Plaintiffs are referred to throughout this Complaint by their initials and assigned first-name pseudonyms.

7.     During the separation, Defendant further ignored the law and its duty to care for separated families—failing to take basic steps to protect children, maintain information on family units, or mitigate Plaintiffs' suffering while in government custody.  Among those responsible for the government's failures were officials in the United States Department of Homeland Security ("DHS")—who were charged with, among other things, ensuring that information about families in DHS's custody was properly collected and maintained so that family members who arrived together were identified as family units for data tracking—and officials in the United States Department of Health and Human Services ("HHS") and the Office of Refugee Resettlement ("ORR")—who were charged with caring for minor children after they were separated from their parents.

8.     Defendant's care and tracking for the separated children was so deficient that when a federal court finally ordered the government to reunify families in July 2018, government officials were unable to identify which children belonged to which parents.  Children who were too young to speak had to be asked to recognize their national flags to provide a clue as to where they were from.  The federal judge who ordered the reunifications in the action *Ms. L.* v. *ICE*, No. 18 Civ. 428 (S.D. Cal.), observed that while the government could effectively track the physical property it confiscated from immigrants—money, documents, and the like—it had no system to account for the thousands of *children* who were taken from their parents.

9.     A July 2019 report from the Staff of the House Committee on Oversight and Reform (the "House Oversight Staff Report") concluded that the separations were "more harmful, traumatic, and chaotic than previously known."  The report found that children as young as a few months old had been separated from their parents, with at least 18 separated children younger than two years old.

10.     Today, the effects of the separations continue.  Trauma during childhood impacts cognitive development and emotional growth.  Increased stress during childhood can result in increased risk of disease and mental health disorders.  The children—especially the young and most vulnerable—suffer when they are apart from their parents, even temporarily.  Many suffer from mental health conditions that were caused or exacerbated by the separations.

11.     Parents are also scarred from being deprived of the ability to protect their children, of learning of their children's suffering, and of seeing their children's continuing pain.  Parents now suffer from, among other things, fear and anxiety, trouble sleeping, nightmares, painful headaches and dizzy spells, and other symptoms.  These parents also now face an increased risk of exacerbating and developing mental health disorders, including severe anxiety, depression, and suicidal ideation.  In particular, Plaintiffs Andrés and Jacinto continue to suffer physical, mental, and emotional harm as a result of the intentional and negligent acts of U.S. government officials, who purposefully acted to inflict harm and instill terror on them and other Central American immigrants.

12.     There is scientific consensus that family separations cause extreme and lasting trauma.  A report by the HHS Office of the Inspector General issued in September 2019 (the "September 2019 HHS OIG Report") found that "intense trauma" was "common" among children who entered ORR facilities in 2018, with children who had been "unexpectedly separated from a parent" facing additional trauma.  According to the September 2019 HHS OIG Report, "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated.  Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents."  Some children suffered from "acute

grief that caused them to cry inconsolably," "believed their parents had abandoned them," experienced "feelings of fear or guilt," and were "concerned for their parents' welfare."

13.     Plaintiffs Jacinto now seeks redress for himself and on behalf of his minor child, Andrés, for Defendant's violations of law under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA").

14.     Although separated families can never be made whole, justice requires redress for their suffering.  Plaintiffs now seek that justice for themselves.

## PARTIES

15.     Plaintiffs J.J.P.B. ("Jacinto") and A.E.P.F. ("Andrés") are Honduran nationals currently residing in Fort Wayne, Indiana.  Jacinto brings this action on behalf of himself and his minor child, Andrés, age eight.  Jacinto and Andrés entered the United States at the border near McAllen, Texas, on May 16, 2018 and were subsequently separated for about ten months.  Jacinto and Andrés are currently pursuing asylum in the United States.

16.     The United States of America, acting through the Department of Justice ("DOJ"), individuals in the White House Office, DHS, and HHS, "federal agencies" of the United States under 28 U.S.C. § 2671, and their employees, officers, and agents, including but not limited to the Office of the Attorney General within the DOJ; U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of DHS; ORR, a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of HHS, is the appropriate Defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, et seq.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over Plaintiffs' claims against the United States under the FTCA pursuant to 28 U.S.C. §§ 1346(b)(1) and 2675.  On October 21, 2019, Plaintiff Jacinto submitted administrative claims to DHS, CBP, ICE, USCIS, and HHS on behalf of himself and his minor child, Andrés.  None of the agencies has made a final disposition of Plaintiffs' administrative claims and, as six months have passed since Plaintiffs submitted these claims, they are deemed finally denied.  28 U.S.C. § 2675(a).  Plaintiffs have accordingly exhausted all available administrative remedies.

18.     The United States District Court for the District of Arizona ordered that this matter be litigated in United States District Court for the Southern District of Texas under 28 U.S.C. § 1402(b).

19.     Texas's more than 1,200-mile-long border with Mexico is the location for a substantial portion of entries into the United States from Mexico, both with and without inspection.

20.     The Texas border has several official ports of entry, including El Paso, Rio Grande City, Hidalgo, Del Rio, and Laredo ports of entry.

21.     CBP also has a number of Border Patrol Stations in Texas..

22.     A number of ICE detention centers are also located in Texas, including the Bluebonnet Detention Facility in Anson, the East Hidalgo Detention Center in La Villa, the Houston Contract Detention Facility in Houston, and the Rio Grande Processing Center in Laredo.

23.

## I.   PLAINTIFFS' FACTUAL ALLEGATIONS.

### A.   Background on Federal Immigration Law and Practice.

24.     Noncitizens who come to the United States, whether or not at a designated port of entry, may apply for asylum, withholding of removal, or other immigration relief.  *See* 8 U.S.C. § 1158(a)(1); *see also* 8 U.S.C. § 1225(b).

25.     The protections of the Fourth and Fifth Amendments to the United States Constitution—including the rights to be free from unreasonable seizures, the right to Equal Protection, and the right to family integrity—apply to all persons present in the United States.

26.     Various federal agencies are involved when a noncitizen (child or adult) is detained.

27.     First, the noncitizen is typically brought to a CBP facility near the border, which is intended to be a short-term holding facility.

28.     Next, adults who remain in custody are typically transferred from CBP to ICE custody, where they may be held in longer-term ICE detention facilities, removed, or released under supervision pending legal proceedings.[2]  Prior to Defendant's use of forced family separations beginning in or about mid-2017, upon arrival in the United States, a child was typically

---

[2]   Noncitizens without valid status who cross the U.S. border may be prosecuted for misdemeanor improper entry under 8 U.S.C. § 1325.  8 U.S.C. § 1326 criminalizes illegal re-entry as a felony for noncitizens who, after having been denied admission, or were excluded, deported, or removed, then enter, attempt to enter, or are found in the United States.  Over the last 20 years, less than one-third of apprehensions by CBP have resulted in criminal prosecutions under these statutes, and any sentences imposed tend to be short, ranging from two to fifteen days.

separated from a parent or legal guardian only where there were specific concerns that the parent represented a danger to the child or was otherwise unfit. *See generally Ms. L.* v. *ICE*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018).

29.     ORR is the federal agency tasked with overseeing the care and custody of children under 18 years old without immigration status who enter the United States, and have neither a parent nor a legal guardian in the country, or who are taken away from their parents or guardians. Such children have been deemed "unaccompanied alien children," or "UACs"—even when they arrived in the United States with a parent but were forcibly taken from that parent.

30.     Pursuant to federal law, certain protections apply to UACs in ORR custody. Among other things, they are supposed to receive care and be in contact with family members. Applicable standards require that DHS and HHS hold minors in facilities that are "safe and sanitary," consistent with the agencies' "concern for the particular vulnerability of minors." No matter where they are detained, whether in CBP or ORR custody, children must be provided toilets and sinks, water and food, medical assistance, adequate temperature control and ventilation, supervision necessary to protect them from others, and "contact with family members." *Flores* v. *Reno*, Stipulated Settlement Agreement, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997).

31.     The William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. 110-457, 122 Stat. 5044 (2008), permits ICE or CBP, absent exceptional circumstances, to detain unaccompanied children for only up to 72 hours to allow ORR to locate an appropriate facility or attempt to place the child with available parents or legal guardians. *See generally* 8 U.S.C. §§ 1232(c)(2)–(c)(3). Otherwise, ORR must locate relatives, friends, or caretakers in the United States to serve as sponsors and care for the children during the pendency of their immigration proceedings. *Id.*

32.     Andrés is the eleven-year-old son of Jacinto.  In May 2018, a then six-year-old Andrés fled Honduras with his father after his father's life was threatened.  Andrés and Jacinto entered the United States at the border near McAllen, Texas, on May 16, 2018.  After entering, Jacinto sought out border agents to turn himself in and seek asylum, and both Andrés and Jacinto were taken into the custody and control of the United States government.  The United States, having custody and control over both Andrés and Jacinto owed Andrés and Jacinto a special duty of care under Texas law.  *See Applebaum* v. *Nemon*, 678 S.W.2d 533, 535-36 (Tex. App. 1984); *see also B.Y.C.C.* v. *United States*, No. 22-CV-6586, 2023 WL 5237147, at *12 (D.N.J. Aug. 15, 2023).

33.     On May 17, 2018, after Andrés and Jacinto were held together in an *hielera* overnight, CBP officers in green uniforms came into the cell to take Andrés from Jacinto as part of the Zero Tolerance practice of separating families to harm them.  Andrés became hysterical, clinging to his father and begging him not to let the guards take him away.  The officers offered no explanation and indeed, under Zero tolerance practices were directed to separate all families arriving at the border.  The officers told Jacinto and Andrés only that they could do things the "easy way" or the "hard way."  Although Jacinto protested, the officers pulled Andrés kicking and screaming out of his arms.  Jacinto thrust Andrés' birth certificate and Jacinto's Honduran Cedula, a national identification card, at the officers to prove that he was Andrés' father, but the officials ignored him.  Instead, the guards told Jacinto that Andrés was not his son and that Jacinto had only brought Andrés with him so that Jacinto could stay in the United States.

34.     The officers then forced Jacinto to face and hold his hands against the wall so that he could not watch Andrés being taken away.  In that moment, an officer told Jacinto that his son

now "belonged to Trump."  Jacinto yelled to the officers taking Andrés that Andrés had a heart murmur.  The officers asked no questions and were uninterested in Andrés' medical condition.

35.    Jacinto was then taken into a different holding area, where he sat, weeping.  No one explained why his son was taken from him, he received no information about Andrés' whereabouts, and he had no idea when, or if, he would see Andrés again.  A guard mocked him for crying "like a little girl."  The guard then told Jacinto that he would see his son in three days, which was a lie.

36.    In fact, Jacinto did not see Andrés for ten months.  Andrés was transferred to ORR custody and placed with a foster family in the Bronx, New York.  Jacinto finally spoke to Andrés a few weeks after their separation, at which time he learned that the foster parents had Andrés call them "Mom" and "Dad."  Jacinto feared that these strangers were trying to take his place as Andrés' father.   Over the months that Jacinto and Andrés remained separated, their communications were restricted, with Jacinto allowed one ten-minute call every eight days.

37.    As of this time, the "Zero Tolerance" practice was in full effect.  Under this practice, as further described below, border patrol agents had no discretion.  Border patrol agents had to refer for prosecution those who committed the misdemeanor of unlawful entry or re-entry under 8 U.S.C. § 1325(a), all as a pretext to separate children from their parents to deter migrants from coming to the United States.  In separating Jacinto and Andrés to further the administration's stated goals of deterring families coming to the United States from Central America, the United States violated their constitutional due process rights and federal law.

38.    To the best of his knowledge, Jacinto was never criminally charged in connection with his entry into the United States.  Neither a prosecution of Jacinto nor any criminal history were the basis for Plaintiffs' separation.

39.     Had it not been for the United States's unconstitutional and tortious conduct resulting in the separation of Andrés and Jacinto, Andrés and Jacinto could have been housed together in, for instance, a Family Residential Center.  Neither Andrés nor Jacinto had any convictions that would have made either of them ineligible.

40.     Jacinto was deceived by ICE officials into agreeing to removal.  An ICE officer convinced Jacinto to sign a document, written in English, a language Jacinto could not read, by telling Jacinto that signing it was necessary for his asylum case.  After he signed, the officer laughed and told Jacinto he had just agreed to his own removal.  Jacinto's decision to sign these papers was the result of coercion and was in no way voluntary.

41.     Jacinto was deported in late May 2018.  As he was taken to the airport, an immigration officer assured him that Andrés would be waiting at the airport to fly with him back to Honduras.  But when Jacinto arrived at the airport, his son was not there.  Instead, Andrés remained thousands of miles away in the Bronx, in the care of two strangers he was told to call "Mom" and "Dad."

42.     Jacinto would not see Andrés again for nearly a year, and only after Jacinto returned to the United States.  After they were reunified, the trauma of their separation was apparent: Andrés suffered nightmares, sleepwalked, and was difficult to control.

43.     The United States's separation of Plaintiffs, the manner in which Plaintiffs were separated, the length of time Plaintiffs were separated, and the lies to Jacinto violated Plaintiffs' constitutional rights in a way that shocks the conscience.  Additionally, the United States's designation of Andrés as a UAC to send him away from his father was also an unconstitutional action.

44.     Jacinto and Andrés continue to suffer from these traumas to this day.  Andrés now acts out more than he did before his separation from his father, has a short temper, is forgetful and inattentive, and cries frequently.  He also has difficulty being apart from Jacinto.

45.     Jacinto and Andrés are currently in the process of pursuing asylum or withholding of removal.

## II.     THE FAMILY SEPARATION CRISIS BEGINS.

### A.     In Early 2017, Defendant Unlawfully Separated Families, Based on Discriminatory Animus.

46.     In or around early 2017, high-level U.S. government officials, including John Kelly (then Secretary of DHS and future White House Chief of Staff), Stephen Miller (Senior Advisor to the President), Kirstjen Nielsen (then Kelly's Chief of Staff and future Secretary of DHS), Gene Hamilton (then Counselor to Attorney General Jeff Sessions), and L. Francis Cissna (then Director of USCIS), began discussing the possibility of separating families at the southern border as a means to punish Central American immigrants and to discourage more Central Americans from applying for asylum in the United States.

47.     The concept of separating families was introduced broadly by DHS Asylum Chief John Lafferty, in a closed-door town hall event for DHS officials on February 2, 2017.

48.     Two weeks later, on February 14, 2017, representatives from ORR, the DOJ, and DHS met in Washington D.C. to discuss separating families at the southern border.  Upon information and belief, government officials from the White House, DOJ, DHS, and HHS/ORR either attended the February 14, 2017 meeting, were briefed on it, or learned in the course of his or her work that widespread family separations were being contemplated.

49.     Commander Jonathan White of the U.S. Public Health Service (then Deputy Director of ORR's UAC Program) attended the February 14 meeting.  Commander White was

alarmed that widespread family separations were being considered.  He repeatedly warned other federal officers about the harm separations would have on children.  Commander White raised several specific concerns:  Widespread family separations would risk unnecessary emotional harm to children, would contravene ORR's duty to act in the best interest of children, and would cause a capacity issue for ORR due to lack of bed space—*particularly for children under the age of five.* Commander White later testified before Congress that he raised these concerns to high-level HHS officials.  Upon information and belief, Commander White warned about the traumas of family separation.

50.     On March 3, 2017, Reuters reported that, according to three government officials, DHS was considering a proposal to separate "women and children" crossing the U.S. border.

51.     Three days later, on March 6, 2017, Kelly, then Secretary of DHS, was asked about the proposal in an interview on CNN.  He confirmed that he and DHS were considering the proposal and specifically described the proposal to separate families along the southern border as part of an effort to exclude immigrants from Central America.  Kelly said, "Yes, I am considering [separating families] in order to deter more movement along this terribly dangerous network.  I am considering exactly that.  They [children] will be well cared for as we deal with their parents."

52.     Kelly's March 6, 2017 televised statements were publicly condemned, and numerous constituencies objected to the pursuit of widespread family separations as unconstitutional and severely traumatic.

53.     For example, the American Academy of Pediatrics ("AAP") issued a public statement on March 4, 2017 that separation would cause children trauma, and noted that "[p]roposals to separate children from their families . . . to deter immigration are harsh and counterproductive," and "urge[d] policymakers to always be mindful that these are vulnerable,

scared children." On May 8, 2018, AAP issued a second public statement reiterating its position and noting that family separation "can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health."

54.     On April 5, 2017, one month after his televised statements discussed above, Kelly appeared to backtrack, at least in testimony to Congress. When asked if he was considering separating children from their parents, Kelly testified before Congress that he would not routinely separate children from their parents and would allow such separations *only if the life of the child was in danger*. He testified that he could not imagine separating children from their parents otherwise.

**B.      July Through October 2017:  Defendant Pushes Forward
a Pilot Program to Separate Families from Central America.**

55.     Despite Kelly's public denials to Congress, in July 2017, the United States began a covert "pilot program" to test family separations at particular CBP facilities along the southern border.

56.     These 2017 separations were then executed under McAleenan's and Provost's direct supervision.

57.     Yet, on multiple occasions between February 2017 and April 2018, when Commander White expressed concerns that separating families would cause children severe trauma, Lloyd and Wynne (who was, at that time, the HHS Secretary's Counselor for Human Services) falsely informed Commander White that ORR need not plan for increased numbers of separated children because the U.S. government was not separating families.

58.     Despite these false denials, hundreds of children were separated from their parents during this pilot program in 2017.

59.     Under the pilot program, sometime after the children and parents were separated, the children were transferred from CBP to ORR custody.  When the children arrived at ORR-contracted facilities, those responsible for their care were not informed about the separations generally, or that these children had been separated.  Case workers and attorneys representing the separated children (especially the very young children) were not told that the children arrived in the United States with parents, did not know that the separated parents were being detained in the United States, and had no way to identify where and who those parents were.

60.     Although the pilot program was largely invisible to the public, immigrants' rights advocates began to piece together that families must have been forcibly separated in large numbers at border detention facilities.  They did so based on the changing demographics and numbers of children flooding into ORR shelters and foster care.  These shelters were accustomed to housing fairly consistent numbers of unaccompanied children in the 14-to-18-year-old range, because those children are more likely to have traveled on their own.  But, suddenly, they saw a sharp spike in the number of children entering ORR care, and the children they were now seeing were much younger, even babies and toddlers.  These children could not have attempted to travel on their own. In addition, they appeared disoriented and traumatized.

61.     Based on what they were seeing, in December 2017, organizations filed a complaint with DHS.  The groups explained that illegal family separations must have been occurring at the southern border in significant numbers in 2017, and they urged DHS to investigate and stop the practice of separating families for purposes of punishment and excluding immigrants from Central America.  Among other things, the groups argued that "the practice of dividing family units at the border leads to the unlawful result of depriving asylum seekers of access to the asylum process"; was "so fundamentally unconscionable it defies countless international and domestic laws on child

welfare, human rights and refugees"; violated the standards and mandate of CBP and ORR; and caused "[severe] trauma" to the separated families.

62.     Upon information and belief, neither DHS nor any governmental agency conducted any study of the medical or psychological effect the separations were having on the separated children or parents.

**C.     December 2017:  The Family Separation Memo.**

63.     In December 2017, several government officials collaborated in drafting a secret internal memorandum (the "December 2017 Family Separation Memo"), which described a plan to effect widespread family separations along the southern border, including in Arizona.

64.     The December 2017 Family Separation Memo describes options for achieving the goal of excluding Central American immigrants from entering the United States at the southern border, including by separating immigrant families.  The Memo contemplated that parents and children would be put in the custody of different federal agencies so they could be kept in different facilities.

65.     In one of his comments on the December 2017 Family Separation Memo, Hamilton noted the need for sufficient media coverage of family separations in order to send a message to other would-be immigrants.

**D.     January 2018 Through May 2018:  Family Separations Build.**

66.     Following the December 2017 Family Separation Memo, government officials conspired to expand forcible separations of children and parents all along the southern border, and did so in the face of growing public opposition to the separations and their effects on children.

67.     During a Cabinet meeting at the White House in early 2018, Attorney General Sessions told then-President Trump that, in response to the influx of asylum seekers from Central America, Nielsen needed to stop letting people from Central America into the country.

68.     On January 23, 2018, Nielsen received a letter from the Children's Defense Fund, on behalf of more than 200 organizations with recognized expertise in the fields of child welfare, juvenile justice, and child health, development, and safety.  The letter implored Nielsen to "reverse course" given that increasing family separations "will have significant and long-lasting consequences for the safety, health, development, and well-being of children."

69.     The separations also started to be challenged in federal court as unconstitutional. On February 26, 2018, Homan, Nielsen, Sessions, McAleenan, Cissna, Azar, and Lloyd were named defendants in their official capacity in a class action habeas petition, which became known as the *Ms. L.* litigation.  *See Ms. L.* v. *ICE*, No. 18 Civ. 428 (S.D. Cal. Feb. 26, 2018).  Still, the United States pressed ahead.

70.     On April 23, 2018, Homan, Cissna, and McAleenan co-authored a memorandum to Nielsen seeking further approval for expanded family separations along the southern border (the "2018 Family Separation Memo").

71.     Upon information and belief, Provost consulted with and advised McAleenan regarding the 2018 Family Separation Memo, which was sent to Nielsen.

72.     Shortly after Nielsen received the 2018 Family Separation Memo, she met with McAleenan, Homan, and Cissna in the Ronald Reagan Building in Washington, D.C. to discuss expanding family separations.  At that meeting, Nielsen agreed with McAleenan, Homan, and Cissna to pursue separation of families entering the United States at all points across the southern border.

73.     Upon information and belief, senior officials from the White House, DOJ, DHS, and HHS,  and others at DHS, CBP, and ICE, HHS, and ORR,  discussed family separations in multiple meetings.  They also drafted, reviewed, and edited memoranda that spelled out how to deter immigrants by separating families at the southern border, despite warning as to the traumas that separated families would experience.  They repeatedly and deliberately ignored warnings from, among others, Commander White and public interest groups that separating families would violate civil and constitutional rights and cause both children and parents physical and psychological harm.

74.     Through these meetings and other directives in early 2018,  Attorney General Sessions, Kelly, Nielsen, Hamilton, Miller, Homan, Cissna, and McAleenan directed individuals at CBP and ICE to separate families at the southern border, including in Texas; and these officials at CBP and ICE knowingly and voluntarily did so.

75.     Upon information and belief, these discussions were conducted in secret, without consulting career technical experts in the government in order to avoid interference from those who did not share their objectives.  Indeed, individuals with technical expertise were excluded because they knew that widespread family separations were illegal and inhumane.

**E.     "Zero Tolerance" and Other Practices to Separate Families.**

76.     The United States employed a number of practices to separate families.

77.     In some cases, the United States offered no reason or justification for the separation.

78.     At other times, when a family presented themselves legally at a port of entry to apply for asylum, the United States would claim that it was unsure that the adult traveling with the child was truly the parent and then separate the child, without taking any steps to verify parentage.

79.     The United States also used the tactic of criminally prosecuting the parents for crossing illegally, even if they were seeking asylum.  Specifically, on April 6, 2018, Attorney General Sessions publicly announced a "Zero Tolerance" directive to all U.S. Attorneys along the southern border, including in Texas, to prosecute anyone who committed the misdemeanor of unlawful entry or re-entry under 8 U.S.C. § 1325(a).  Previously, asylum seekers, especially families, had not been systematically referred for prosecution for the misdemeanor of crossing the border illegally.  Over the last 20 years, less than one-third of apprehensions by CBP have resulted in criminal prosecutions, and any sentences imposed tended to be short, ranging from two to 15 days.

80.     In other cases, the United States did not even claim a pretext for the separation.

81.     The "Zero Tolerance" announcement was  just a pretext for the goal of furthering the widespread separations of Central American parents and children along the southern border. Indeed, Nielsen later admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Sessions *prior to* the "Zero Tolerance" announcement.

82.     After the "Zero Tolerance" announcement, a parent would be prosecuted, but usually received a sentence of time served that amounted to approximately 48 hours or less in jail, after which the parent would be returned to immigration custody.  During the brief time the parent was incarcerated, the child would be taken away, often flown across the country, and not returned to the parent even after the parent was returned to ICE custody.  In fact, one border patrol agent noted that it was possible that a parent could go to court and come back to the detention center *the very same day*, only to find his or her child already missing, either moved to another CBP facility or transferred to ORR custody.  In some cases, parents were purposely transferred to ICE custody

after the prosecution in order to ensure that they were separated from their children—who remained in CBP custody for some period after the separation occurred.

83.     The United States further claimed that when a parent was prosecuted, they had no choice but to separate the child because the child could not be housed in the jail.  But Defendant has never explained why the government did not reunite the children once the parent had been returned to ICE custody after the brief period in criminal custody.  Children could have and should have been immediately reunified with their parents, and Defendant had no justification for failing to do so.  Nevertheless, rather than being separated from their parents for approximately 48 hours, children often spent significantly more time separated from their parents.

84.     There was no justification for Defendant's refusal to reunite families after the initial separations.  Some families remained forcibly separated for many months or even a year or more.  For extended periods, children and parents did not know what happened to each other and could not communicate.

85.     While Defendant claimed that "Zero Tolerance" was evenhanded and designed to prosecute anyone who crossed the border illegally, whether a single adult or a family seeking asylum, in fact, "Zero Tolerance" was not an evenhanded practice.  It is now clear from released internal government memoranda that the government prioritized the criminal prosecution of parents precisely to achieve the separations of Central American families and inflict cruelty.

## III.    MAY 2018 THROUGH JULY 2018: THE FAMILY SEPARATION CRISIS EXPLODES.

86.     Following Nielsen's evident approval of the 2018 Family Separation Memo, the government began to separate parents and children at substantially increased rates and in substantially increased numbers.  Indeed, according to the House Oversight Staff Report, between

May 7, 2018 and June 20, 2018—a period of just six weeks—*at least 2,231 children* were separated from their parents along the southern border.

87.     These separations, like the earlier ones, were effected in a brutal manner by DHS. Many children were forcibly taken from their parents' arms over the pleas of both parent and child. The government separated children with known medical conditions or disabilities from their parents without bothering to obtain critical medical information.  Parents were routinely lied to and deceived.  They were told their children were being taken for a bath, or that the separation would last a few hours, only to have the children never return.  Other parents were told that the separations would be indefinite or that they would never see their children again.  And all parents were left wondering for hours, days, weeks, and even months as to where their children were, how they were doing, who was caring for them, when they could talk to them, and when they could be reunited.

### A.     Defendant Subjected Families to Punitive Conditions of Confinement.

88.     By separating parents and children, keeping families apart, and restricting (and even eliminating) their communication during the period of separation, Defendant deliberately imposed, and was deliberately indifferent to, punitive conditions of confinement on Plaintiffs.  The already punitive and traumatic separation experience was made worse by the lack of communication and generally inhumane conditions of confinement to which the families were subjected, both before and after separation.

89.     While in custody, parents and children were subjected to ethnic slurs by DHS officials.  Parents and children also endured mockery and verbal abuse.  Audio recording leaked from a detention facility in June 2018 revealed the wailing of recently separated children between the ages of four and ten.  DHS officials could be heard laughing, and one joked: "Well, we have

an orchestra here—what's missing is a conductor." This type of harassment and cruelty was permitted, and not checked by the corrective polices, training protocols, supervision, or discipline that DHS officials should have put in place. DHS officials failed to craft a reasonable response because allowing this harassment and cruelty advanced their intent to punish those in their custody.

90.     After being separated from their parents, children were transported to ORR-contracted facilities across the country, some thousands of miles from their parents. They were put in cars, vans, buses, and airplanes—often their first time on a plane—without explanation as to where they were going, what would happen to them at their unknown destination, and when they would see their parents. Upon information and belief, DHS intentionally withheld this information, and HHS/ORR instructed those within the chain of command to withhold this information.

91.     The experience of being in ORR custody was devastating for separated children. Lawyers representing separated children recall that, when entering ORR shelters, the sound of crying was often overwhelming. Other children were so traumatized that they could not even speak.

92.     While any amount of forced separation from their parents would have been traumatic, the detention of these children was made worse by the prolonged length of the separations. While in prior years ORR typically held unaccompanied children for just over one month (the time it took to find a sponsor), the July 2019 House Oversight Staff Report found that separated children (who had parents in the United States) were detained for an average of approximately three months. About three percent of those children were separated for more than six months, and some children did not see their parents for much longer. Notably, these statistics underestimate the length of time that children and their parents were actually separated because

they account for only the length of time a child was in ORR custody and do not account for time that children were in the custody of a sponsor who was not their parent. Without access to the data that Defendant should have maintained, the true length of average separations can be only estimated.

93.     During the prolonged separations, children were prevented from talking with their parents for weeks or months, which also heightened the trauma. This was avoidable. DHS and HHS/ORR officials knew that thousands of families would be separated. Yet, DHS and HHS/ORR officials failed to develop and implement any process through which families could communicate with one another. The September 2019 HHS OIG Report concluded that this lack of communication during the period of separation "contributed to children's anxiety and fear for their parents' well-being."

94.     For many children, communication came only after their non-government case workers or lawyers identified and tracked down their parents.

95.     Once family connections were established, many DHS and HHS/ORR officials neither directed staff to facilitate communication between parents and children nor provided training in how to facilitate such communication. The *Ms. L.* court identified deficiencies and ordered the government to facilitate communication between separated family members. *Ms. L.*, 310 F. Supp. 3d at 1149–50.

96.     It was obvious to the United States that these punitive conditions of confinement would further harm the separated families. Yet it ordered, facilitated, and executed the separations anyway—all in furtherance of a goal to punish immigrants from Central America.[3]

---

[3]     Upon information and belief, there are internal reports at HHS, ORR, CBP, ICE, and/or DHS that will demonstrate that the United States knew of the punitive conditions that were being imposed on Plaintiffs.

**B.      Many Separated Parents Were Deported Without Their Children Due to Misrepresentations and Coercion by DHS Officials.**

97.      After the trauma of separations, hundreds of parents were coerced or misled by DHS officials to consent to their own removal.  These parents were not only unlawfully denied a meaningful opportunity to seek asylum or other appropriate immigration relief; they also experienced a far longer period of separation from their children.

98.      DHS officials lied to parents and told them that waiving their rights to asylum was the only way to be reunited with their children.  They also misrepresented to separated parents that they were ineligible for asylum or that pursuing an asylum case would extend the separation from their children.

99.      Some parents, including Jacinto, were tricked into supposedly consenting to their own deportation by being told that the removal document—which they could not understand because it was in English with no Spanish or other translation—was necessary for their asylum case.  Absent the coercion and the trauma of separation, most of these deported parents would not have abandoned their rights to seek asylum in the United States.

100.      Other separated parents signed removal papers they could not understand because of the confusion, trauma, or sense of futility that they felt as a result of the separation.  The horror of the separation experience caused these parents simply to give up because they did not think they would ever be reunited with their children in the United States.

101.      The actions by DHS to coerce parents into waving their rights were flagrant violations of Plaintiffs' legal rights.  Many parents, including Jacinto, were separated from their children for much longer than they otherwise would have been because they were coerced into agreeing to their own deportation.  Others were wrongfully deprived of an opportunity to remain

in this country permanently when DHS coerced them into waiving their asylum claims. The consequence was to return to countries where they face violence or persecution.

102.    Hundreds of parents, including Plaintiff Jacinto, were deported without their children. Their children were stranded in the United States, thousands of miles away from their parents, with little or no ability to communicate with their parents or other family members. And some parents were deported even after the injunction in the *Ms. L.* litigation went into effect that supposedly halted such deportations.

103.    In the *Ms. L.* litigation, the court granted requests by 11 parents deported without their children to be returned to the United States. *Ms. L.* v. *ICE*, No. 18 Civ. 428, ECF No. 456 (S.D. Cal. Sept. 4, 2019). As to six of those parents, the court found that various factors made it such that their decisions to withdraw asylum claims and agree to removal were not the product of free and deliberate choice. In particular, the court found that factors such as prolonged separation from and lack of communication with their children undermined the voluntary nature of the parents' decisions. The court also found that, at least in some instances, government officials used heavy-handed coercive measures, including threatening a parent that if he did not withdraw his asylum claim, his child would be taken from him and put up for adoption.

**C.    DHS and HHS/ORR Failed to Prepare the System for the Separation Crisis.**

104.    The explosion in the number of family separations and the influx of separated children—particularly tender age children—imposed new burdens on the ORR system. DHS and HHS/ORR officials failed to prepare or warn those who would be responsible for the care of separated children that a substantial number of young, traumatized children would be entering ORR custody. As a result, ORR facilities and foster families failed to provide necessary medical, mental health, and other services to separated children, exacerbating their trauma.

105.    ORR is charged with administering the care of unaccompanied children and must provide a variety of services, including: suitable living accommodations; food; appropriate routine medical and dental care; educational services appropriate to the minor's level of development; at least one individual counseling session per week and group sessions at least twice a week; and visitation and contact with family members.

106.    ORR failed to prepare its facilities for a large influx of very young and highly traumatized children and, as a result, breached the duty to properly care for the children in ORR custody.

107.    ORR's UAC system was designed to care for the most common demographic: unaccompanied boys between the ages of 12 and 17—with an average age of 15.  Children 12 and under are deemed of "tender age."  Historically, tender age unaccompanied children are less common because most young children enter the United States with a parent or guardian.

108.    Not surprisingly, tender age unaccompanied children require particularized care, including facilities that are specifically licensed to house young children.  When the family separation crisis began in 2017, there were only a limited number of facilities licensed to house tender age unaccompanied children.

109.    The more typical, older unaccompanied children are usually prepared when they arrive in the United States.  They often bring documents, like their birth certificates, and the names and contact information for family or friends in the United States.  They generally understand what will happen to them and can participate in decisions about planning for their release.

110.    By contrast, tender age separated children require a completely different approach to case management.  These young children typically are not prepared to be separated from their parents, cannot understand what is happening, and cannot provide information about themselves

or their parents.  Dozens of children separated in 2017 and 2018 were not even verbal, and many were still in diapers.

111.    Upon information and belief, HHS/ORR officials received daily trend reports that identified, among other things, spikes in the number of children crossing the border and increased migration from a particular country.  The trends were typically analyzed each week to identify any need for changes in policies, practices, training, or shelter capacity.

112.    Upon information and belief, these trend analyses put HHS/ORR on notice of the demographic changes associated with family separations, including an increase in the number of unaccompanied children.  The trend reports provided "storm warnings"—data-driven insight into the increasing number of family separations.  In addition, the ORR facilities were experiencing an increase in very young unaccompanied children.  The concerns repeatedly raised by Commander White amplified these storm warnings.

113.    A January 2019 report by the HHS Office of the Inspector General (the "January 2019 HHS OIG Report") concluded that ORR officials observed a steep increase in the number of separated children as early as the summer of 2017.  The January 2019 HHS OIG Report also found that, as early as November 2017, internal ORR emails recognized "that separated children were often very young, that these younger children required placement at specially licensed facilities, and that 'the numbers of these very young UAC[s] resulting from separations has on some dates resulted in shortfalls of available beds.'"

114.    The unusual increase in very young children placed insurmountable pressure on the UAC system and warranted significant changes to ORR practices if appropriate care were to be provided.  Yet HHS/ORR took no meaningful steps to pursue such changes.  For example, Lloyd and others either deliberately, or knowingly and recklessly, failed to engage emergency planning

teams to plan for or respond to the changes in the demographics of unaccompanied children—even though HHS generally, and ORR specifically, have designated staff with emergency planning responsibilities and expertise.

115.    Moreover, HHS/ORR failed to provide warnings to the facilities responsible for the daily care of unaccompanied children—leaving shelter staff unaware that children had been forcibly separated from their parents and ensuring that shelters would be ill-prepared for the challenges of the separation crisis.

116.    Shelter staff and children's advocates who saw changes in the demographics of the "unaccompanied" children in 2017 and early 2018 did not initially understand what was happening or the reasons for the changes.  It took time to figure out that a child now in ORR custody had not arrived "unaccompanied" but had been separated from his or her parent at the border and that the parent was likely elsewhere in the United States.

117.    At the same time that HHS/ORR failed to inform facilities that many children in their care had been forcibly separated from their parents, in June 2018, ORR changed its sponsor screening requirements, leading to significant delays in releasing children to sponsors, including their parents.  As the September 2019 HHS OIG Report explains, "ORR revised its sponsor screening requirements and began mandating fingerprint-based FBI criminal history checks of all potential sponsors, including parents, and all adult members of their households.  Further, these fingerprints were shared with ICE and could be used for immigration enforcement purposes."

118.    As a result of both the confusion about the children's "unaccompanied" status and the new screening requirements, separated children remained in ORR custody three times longer than typical unaccompanied children, as described *supra*.  According to the September 2019 HHS OIG Report, "[f]acilities reported that children with longer stays experienced more stress, anxiety,

and behavioral issues, which staff had to manage," and even children "who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer."

119.    The resulting chaos expanded as the number of separated children increased.  At some point, available bed space for tender age children was exceeded.  In spring 2018, HHS/ORR officials, including Lloyd, rushed to license more facilities to house the growing number of tender age children.  Upon information and belief, new facilities were licensed without being adequately warned about the separations or how the children would be affected.

120.    As a result of the rushed licensing and HHS/ORR officials' failure to advise, shelters had inadequate resources with which to care for the youngest children.  Among other things, shelters lacked sufficient diapers, wipes, changing tables, cribs, and staff to care for young children who were not yet mobile.  Children were provided with insufficient education and recreation opportunities.  In general, the shelters were grossly under-resourced and understaffed.

121.    When ORR lacked adequate bed space to house the youngest separated children, foster families were hastily recruited.  Existing foster families who fostered one or two children were asked to foster three, four, or even five children to accommodate the increasing number of separated children.  Upon information and belief, the foster families were not told that the children had been separated from their parents.  Separated children experienced greater conflict within foster placements than is typical because families were ill-prepared to care for so many traumatized young children, and there were often too many children in each home.

122.    DHS and HHS/ORR failed or, as happened with Andrés, refused to collect children's medical histories before taking them from their parents.  While some medical conditions were visible, other conditions and full medical histories could have been gathered only from the parents—including for conditions like anxiety or depression or food allergies.  That was especially

true for the younger children, who could not be expected to explain their medical histories or health care needs.  Indeed, many children were pre-verbal.  As a result, some children were deprived of necessary care.

123.   Even those DHS and HHS/ORR officials who did not intentionally forgo the collection of medical information nonetheless ordered, facilitated, and executed separations with deliberate indifference to the importance of children's medical histories.  That indifference was evidenced, in part, by DHS and HHS/ORR officials' failure to develop any plan, policies, guidance, or training to ensure that children's basic medical histories would be collected before or soon after the separations and recorded.

124.   Lloyd later admitted to Congress that he and other HHS/ORR officials knew children would suffer mental health consequences from the separation experience.  Yet these officials failed to prepare the UAC system for the arrival of so many uniquely traumatized children.  HHS/ORR did not adequately warn shelters about the separations and failed to adopt policies or practices, or provide training, to ensure that separated children would be properly treated for their extreme and ongoing trauma.

125.   The September 2019 HHS OIG Report described how children who did not understand why they had been separated from their parents "suffered elevated levels of mental distress" and recounted the experience of one young boy who, without any explanation for why he had been separated from his father, "was under the delusion" that his father had been killed and believed that he would be killed as well.  The child ultimately required emergency psychiatric care.

126.   Defendant's failure to warn the shelters regarding the ever-increasing numbers of separated children entering ORR custody meant that there were too few case workers available to

take children to medical and mental health appointments, even in cases where children needed specialized care with outside providers.

127.    In the cases where health care was provided to separated children, that care was often provided without the consent of or consultation with the children's parents because medical providers did not know how to contact the parents.  For example, some separated children were institutionalized and/or prescribed medications without their parents' consent or knowledge. Attorneys appointed to represent the children were shocked that commitment proceedings went forward without parental involvement, which is required in the ordinary course.

128.    HHS/ORR also made no plans, provided no training, and issued no warning to shelter staff or foster families that additional translation resources would be needed.  This occurred despite trend reports that showed a sharp increase in children from Guatemala—where many people speak exclusively indigenous languages.  For these children, the inability to communicate or understand what was happening intensified their trauma.  Some children learned English or Spanish and lost fluency in—or even the ability to speak and understand—their native language. These children lost not only their connection to their culture; some lost the ability to meaningfully communicate with their parents once reunified.

129.    Each of the failures detailed above intensified the damage that children experienced from the separation from their parents.

**D.    June 2018:  Family Separations Prompted Widespread Public Outcry.**

130.    The substantial increase in separated families drew national attention and widespread public condemnation.  In May 2018, the American Academy of Pediatrics issued a statement rebuking the "sweeping cruelty" of family separation.  The United Nations Office of the High Commissioner for Human Rights described family separation as an "arbitrary and unlawful

interference in family life" and "a serious violation of the rights of the child."   Religious leaders and organizations from numerous faith traditions—including Pope Francis, the United States Conference of Catholic Bishops, the Southern Baptist Convention, national Jewish organizations and institutions, the Quakers, and others—also condemned family separations.   Pope Francis denounced the family separations and supported statements by the United States Conference of Catholic Bishops that called family separations "immoral" and "contrary to our Catholic values."

131.   On June 17, 2018, former First Lady Laura Bush wrote an op-ed for the *Washington Post*, in which she called the ongoing family separations "cruel" and "immoral" and described published photos of separated children as "eerily reminiscent of the internment camps for U.S. citizens and noncitizens of Japanese descent during World War II, now considered to be one of the most shameful episodes in U.S. history."

132.   On June 18, 2018, ProPublica released audio it had obtained from inside a CBP facility that recorded ten Central American children, who had recently been separated from their parents at the southern border, sobbing and desperately pleading for their mothers and fathers.

133.   Meanwhile, while the pleas of the separated children for their parents were ringing in the nation's ears, members of the administration minimized families' suffering or denied that separations were happening.   For example, Kelly stated in a May 11, 2018 NPR interview that family separation "could be a tough deterrent" and dismissed humanitarian concerns, stating that "[t]he children will be taken care of—put into foster care or whatever."   Similarly, in a June 21, 2018 Fox News interview, Sessions admitted that the government was separating families, adding, "hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."   He did not acknowledge that many families were separated *even though* they came through official ports of entry.

134.     Meanwhile, on May 15, 2018, Nielsen testified before the Senate Homeland Security and Governmental Affairs Committee: "We do not have a policy to separate children from their parents." She repeated this assertion on Twitter a month later: "We do not have a policy of separating families at the border.  Period."  And in a press conference at the White House on June 18, 2018, despite having approved memoranda directing family separations, Nielsen called any claim that she intended for parents to be separated from their children at the border "offensive."

135.     Just two days after Nielsen's press conference, on June 20, 2018, the administration bowed to public pressure and issued an Executive Order that purported to end family separations at the southern border.

136.     The Executive Order, however, did nothing to reunify the thousands of parents and children the government had already cruelly separated.  Those reunifications came only after the federal judge in the *Ms. L.* litigation ordered the government to reunite separated families and closed loopholes in the Executive Order.

**E.     July 2018:  Family Separations Enjoined.**

137.     On July 26, 2018, the federal court in the *Ms. L.* case issued a nationwide preliminary injunction prohibiting the government from continuing to keep families separated absent a determination that a parent is unfit or presents a danger to his or her child.  The court's order required that the defendants reunify all class members with their children within 30 days, and that children under five years old be reunified within 14 days.  *Ms. L.* v. *ICE*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018).

138.     The injunction was based on findings that the government had separated parents from their children, and failed to reunite separated families, without a determination that the parent was unfit or presented a danger to the child and that the government's conduct shocked the

conscience. *Id.* at 1142.  In some cases, parents who had been separated from their children had lawfully presented themselves at ports of entry and had not been charged with any crime or placed in criminal custody. *Id.* at 1139, 1143.  Indeed, the court determined that the government's actions had "resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally." *Id.* at 1143.

139.    The *Ms. L.* court further noted that, as evidenced by the United States's codification of principles of asylum, it was the intent of U.S. law "to treat refugees with an ordered process, and benevolence," yet the government's treatment of the *Ms. L.* class failed to meet that standard or pass constitutional muster. *Id.* at 1144.

140.    Furthermore, the *Ms. L.* court credited scientific and medical evidence that separations caused irreparable harm and that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." *Id.* at 1147.

141.    The court found that the government "has an affirmative obligation to track and promptly reunify these family members." *Id.* at 1145.  Yet, the court noted, the "government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*." *Id.* at 1144.

142.    By December 12, 2018, ORR identified more than 2,800 children believed to have been separated from their parents.  Subsequent disclosures in the *Ms. L.* litigation have identified more than 5,600 separated children.

**F.     Defendant's Failure to Track Family Relationships Prolonged Separations and Prevented Communication.**

143.     In the ordinary course, DHS and HHS data systems record the familial connections of parents and children entering the country together.

144.     After the separations, however, children were deliberately re-categorized as unaccompanied children, indicating that they did not arrive at the border with a parent or guardian. As a result, family relationships were excluded entirely from separated parents' and children's records.   DHS and HHS essentially erased their forcible separations from the data.   DHS nonetheless falsely and publicly insisted that DHS had an adequate tracking system for the separated families.  McAleenan and Provost later conceded in Congressional testimony that there was no central database to match separated children to their parents.

145.     The *Ms. L.* court concluded that children had been separated without any effective system for tracking the family relationship.  310 F. Supp. 3d at 1144.  As the court stated, "what was lost in the process was the family.  The parents didn't know where the children were, and the children didn't know where the parents were.  And the government didn't know, either."[4]

146.     The court described the "startling reality" that "[t]he government readily keeps track of personal property of detainees," which is "routinely catalogued, stored, tracked and produced upon a detainees' release. . . . Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children."  *Ms. L.*, 310 F. Supp. 3d at 1144.  An October 2018 Government Accountability Office report stated that both DHS and HHS were responsible for the inability to identify which child belonged with which parent.

---

[4]  Jacob Soboroff, *Emails Show Trump Admin Had 'No Way to Link" Separated Migrant Children to Parents*, NBC News (May 1, 2019), https://www.nbcnews.com/politics/immigration/emails-show-trump-admin-had-no-way-link-separated-migrant-n1000746.

147.     Because separated parents could not be identified or located, there was no way to easily provide children with information about their parents.  Likewise, there was no way for parents to be provided with information about their children's whereabouts or well-being.  There also was no way for parents and children to talk to each other.

148.     ORR is obligated to ensure the expeditious release of unaccompanied children, yet separated children whom the U.S. government had reclassified as "UACs" could not be reunified with parents no one could identify or find.  The House Oversight Staff Report concluded that the stripping of data connecting parents to their children thus "caused lengthy delays to reunification." Even after parents were finally identified and located, the erasure of the familial relationship in the government databases prolonged the separations.  Because they had no clear record of which child belonged to which parent, DHS and HHS/ORR made parents take DNA tests to *prove* parentage and required them to apply to reclaim their children—as if they were a non-parent seeking to become a sponsor.

149.     The family separations were ordered, facilitated, and executed by Defendant who knew that the link between separated parents and their children would be stripped when the children were reclassified as "UACs" or who demonstrated callous indifference by recklessly ignoring that fact.

## IV.     Defendant Targeted Central Americans Because of Their Race, Ethnicity, and/or National Origin.

150.     Defendant specifically targeted the southern border, the entry point into the United States for most Central American immigrants, while, upon information and belief, immigrant families who arrived at the northern U.S. border or at other ports of entry on the coasts or at airports were not targeted for separation.  And it was Central Americans who were overwhelmingly

affected by Defendant's unlawful conduct:   More than 95 percent of the separated families identified as *Ms. L.* class members are from Central America.

151.    In developing many of its immigration strategies in 2017, the administration appears to have been inspired by a 79-item list of "immigration actions the next president can take" prepared in April 2016 by the Center for Immigration Studies ("CIS").

152.    Many of the proposals on the CIS list are geared toward stopping what it calls the "surge of arrivals on our southern border."   Among other things, the CIS list advocated the detention of asylum seekers; a prohibition on the release of unaccompanied minors to their undocumented relatives living in the United States unless those relatives surrendered themselves to authorities for immigration processing and court proceedings; required DNA testing to confirm familial relationships before releasing unaccompanied minors to family members; selective prosecution of family members who pay to "smuggle" unaccompanied minors into the United States; and the expansion of the expedited removals program.   Defendant used many, if not all, of these tactics in connection with immigration enforcement efforts, including family separation.   In a January 2019 article evaluating the degree to which Defendant had achieved the items on the CIS list, CIS clearly stated that certain of its recommendations were specifically targeted at Central Americans, including its recommendations for restricting the ability of individuals entering at the southern border to claim asylum.

## V.    Separated Families Were Irrevocably and Immeasurably Harmed.

153.    Family separations severely traumatized children and their parents, including Plaintiffs Jacinto and Andrés.

154.    In the case of very young children, such trauma can be permanent.   The president of the American Psychological Association has stated that family separation "is not only needless

and cruel, it threatens the mental and physical health of both the children and their caregivers." Research shows that "trauma caused by family separation threatens mental health as much as the atrocities families experience in the countries they are fleeing." In fact, family separation is "on par with beating[s] and torture in terms of its relationship to mental health."

155. A specialist in child health and development and pediatrics at Harvard, Dr. Jack P. Shonkoff, explained it this way: "Forcibly separating children from their parents is like setting a house on fire. Prolonging that separation is like preventing the first responders from doing their job and letting the fire continue to burn."

156. Those who came into contact with the separated children in ORR custody observed the children's extreme suffering. Some reported the sound of near-constant crying in shelters or, at times, an eerie silence reflecting the absence of ordinary childhood activity.

157. Younger children displayed unusual attachment patterns, including clinging to case workers they had known for only a short period of time. Some children became abnormally attached to foster parents or, particularly in the case of very young children, became confused about who were their actual parents. Other children blamed their parents for the separation, believing that they had allowed it to happen. This damaged children's emotional health and, in some cases, negatively affected children's relationships with their parents on a long-term or even permanent basis.

158. A clinical psychologist in Phoenix who works with children in ORR custody has observed that many separated children "suffer from complex trauma, attachment problems, depression, generalized anxiety and social anxiety." Some of the adolescents she treats "still urinate in bed," and there are young children "exhibit[ing] self-harming behaviors, like cutting." In a study of immigrant families, scientists "found that longer separations from parents during the

immigration process led to higher rates of anxiety and depression," and a second study similarly found that separation placed children "at an increased risk for anxiety, depression, and substance abuse during adulthood."  Additional research has shown that separated children "may also be at increased risk of post-traumatic stress disorder (PTSD)."

159.    The prolonged period of these separations intensified the children's trauma. Psychologists studying neurobehavioral development have found that subjecting young children to institutional environments such as those at issue here can create irreversible changes in the brain, which can lead to trouble with executive function tasks, working memory, inhibition control, and cognitive flexibility, and developmental delays in speech and fine motor skills.  Dr. Shonkoff explains that "when children are removed from their parents, and especially when placed in institutional settings, high and persistent levels of stress activation can disrupt the architecture of the developing brain and other biological systems with serious negative impacts on learning, behavior, and both physical and mental health."

160.    Even reunifications were sometimes painful for the separated families as a result of the severe trauma experienced.  Some separated children expressed anger or refused to engage. Some very young children no longer recognized their parents.  Other children simply clung to their parents and sobbed.

161.    The children who have been reunited with their parents as of the date of this Complaint—including Plaintiff Andrés—were traumatized from their separation experiences. Their symptoms include anxiety, anger, introversion, and regression.  Jacinto's son, Andrés, now acts out more than he did before his separation from his father, has a short temper, is forgetful and inattentive, cries frequently, and is more withdrawn and struggles when apart from his parents.

162.    The separated parents also experienced extreme trauma, and they too received little or no mental health care while detained.  At least one separated father died by suicide following the trauma of separation.  Parents who survived this experience face a heightened risk of depression, anxiety, and other mental health conditions.  They all experienced profound grief and desperation.  For some, the trauma has manifested in physical symptoms, including insomnia, nightmares, painful headaches and dizzy spells, and weight loss.  Plaintiff Jacinto continues to struggle with trauma caused by the separation from Andrés and his powerlessness to help his son.

163.    Defendant caused thousands of families' profound suffering by ordering, facilitating, and/or executing these separations.

### FIRST CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN VIOLATION OF THE FTCA

164.    Plaintiffs incorporate the allegations in Paragraphs 1 through 163.

165.    By engaging in the acts described in this Complaint, federal employees, officers, and officials engaged in extreme and outrageous conduct with intent or reckless disregard for the probability of causing Plaintiffs severe emotional distress.

166.    As a direct and proximate cause of that conduct, Plaintiffs suffered severe emotional distress.

167.    Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

### SECOND CAUSE OF ACTION
### NEGLIGENCE IN VIOLATION OF THE FTCA

168.    Plaintiffs incorporate the allegations in Paragraphs 1 through 163.

169.     Federal employees, officers, and officials had a duty, and a special relationship, to Plaintiffs that required them to act with ordinary care and prudence so as not to cause Plaintiffs harm or injury.

170.     By engaging in the acts alleged herein, federal employees, officers, and officials failed to act with ordinary care and breached the duty of care they owed to Plaintiffs by intentionally, and with malice, harming Plaintiffs.

171.     As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

172.     Under the FTCA, the United States is liable to Plaintiffs for negligence.

### THIRD CAUSE OF ACTION
### LOSS OF CONSORTIUM IN VIOLATION OF THE FTCA

173.     Plaintiffs incorporate the allegations in Paragraphs 1 through 163.

174.     Plaintiffs have suffered severe, permanent, and disabling injuries. They now must contend with the long-term health effects and emotional and psychological trauma caused by the United States.

175.     The wrongful conduct of federal employees, officers, and officials directly and proximately caused these injuries, which substantially interfere with Plaintiffs' capacity to interact with one another in a normally gratifying way and have caused Plaintiffs to suffer damages as a result.

176.     Under the FTCA, the United States is liable to Plaintiffs for loss of consortium.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Enter judgment in favor of Plaintiffs against the United States;

B.      Award compensatory damages to Plaintiffs for the harms that they

suffered as a result of the tortious and unlawful conduct of the federal

employees, officers, and officials referenced above;

C.      Award pre- and post-judgment interest; and

D.      Award such other and further relief as the Court deems just and equitable.

Dated this 16th day of October, 2023.

## DEMAND FOR JURY TRIAL

FTCA claims are tried to the bench.  28 U.S.C. § 2402.  Plaintiffs demand a jury

trial on any claims that are, at the time of trial, triable by jury, whether because of a change of law

or an amendment to the pleadings.

By: */s/ Steven C. Herzog*
Steven C. Herzog
SDTX Bar No. NY2173623
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel. (212) 373-3000
Fax (212) 492-0317
sherzog@paulweiss.com

**ATTORNEY-IN-CHARGE FOR
PLAINTIFFS**

Lee Gelernt (admitted *pro hac vice*)
Daniel A. Galindo (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
Tel. (212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org

Geoffrey R. Chepiga (admitted *pro hac vice*)
Jacqueline P. Rubin (admitted *pro hac vice*)
Hallie S. Goldblatt (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel. (212) 373-3000
gchepiga@paulweiss.com
jrubin@paulweiss.com
hgoldblatt@paulweiss.com

Stephen B. Kang (admitted *pro hac vice*)
Hannah Schoen (admitted *pro hac vice*)
Oscar Sarabia Roman (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-1198
Fax: (415) 395-0950
skang@aclu.org
hschoen@aclu.org
osarabia@aclu.org

Alexander A. Reinert (admitted *pro hac vice*)
55 Fifth Avenue, Room 1005
New York, NY 10003
Tel. (212) 790-0403
areinert@yu.edu

*Attorneys for Plaintiffs J.J.P.B., on behalf of himself and his minor child, A.E.P.F.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, a true and correct copy of the foregoing document was served in accordance with the Local Rules on all counsel of record via the Court's electronic filing system.

_/s/ Steven C. Herzog_
Steven C. Herzog
Attorney-In-Charge